**Bates B. WITT, Appellant,**

v.

**Clyde WATKINS, Appellee.**

No. 3287.

Supreme Court of Alaska.

June 9, 1978.

William D. Artus, Anchorage, for appellant.

Dale J. Walther, Murphy L. Clark Law Offices, Anchorage, for appellee.

## OPINION

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, BURKE and MATTHEWS, Justices.

BOOCHEVER, Chief Justice.

Bates B. Witt sued Clyde Watkins for damages arising out of injuries sustained on October 28, 1975 in an automobile collision. Witt was a passenger in an automobile driven by Watkins. As an affirmative defense, Watkins alleged that the suit was barred because Witt had entered into an agreement releasing Watkins from all claims. Based on the release, Watkins' motion for summary judgment was granted. Witt has appealed, claiming that the release is unenforceable because it is the result of a mutual mistake as to the nature of his injuries.

The motion for summary judgment is supported by the affidavit and deposition of Mark S. Rauch, who was the Field Claims Representative for State Farm Insurance Company, Watkins' insurer. In opposition, Witt filed an affidavit and the written report of Dr. F. Leland Jones, one of the physicians who treated him.

From those documents, it appears that Witt was initially treated in the emergency room of Providence Hospital where he was advised by the attending physician that he had sustained several bruised ribs in the accident. He was fitted with a rib belt and released that same day. On November 3, 1975, complaining of right rib and back pain, he was examined by Dr. Laufer. The doctor informed him that he had one or two cracked ribs and several bruised ribs.

On November 17, 1975, he received a complete physical examination from Dr. F. Leland Jones. Witt complained of discomfort in the right flank and right chest areas. Dr. Jones confirmed the diagnosis of cracked ribs and also discovered a slight elevation of alkaline phosphatase. Because the area of injury was near the kidneys, Dr. Jones decided to perform some kidney func-

tion tests and to refer Witt to Dr. Prindiville, a specialist in internal medicine, and Dr. Coles, a urologist.

Dr. Jones advised Mr. Rauch of Witt's condition and told Rauch that to the best of his knowledge, Witt's continued back and flank pain was not related to the accident. Dr. Jones also indicated to Witt that the back pain was not related to the accident.

Further examination by Drs. Prindiville and Coles revealed a bladder problem, for which surgery was recommended. Dr. Prindiville informed Witt that the symptoms were probably not related to the automobile accident and further stated that the back problem would probably be alleviated by the bladder operation.

Witt first engaged in settlement negotiations by contacting Mr. Rauch early in March 1976. Rauch offered $1,500.00 plus medical bills submitted to date. This offer was declined by Witt. According to Rauch, Witt indicated that he had discussed the matter with his attorney [1] who had advised him to take not less than $5,000.00, plus medical bills, if he decided to settle. On March 8, 1976, the parties agreed on a settlement figure of $3,000.00, plus paid medicals.

An agreement was executed by Witt which released Watkins from any and all claims "on account of all injuries, known and unknown, both to person and property, which have resulted or may in the future develop" from the accident of October 28, 1975.

On or about May 3, 1976, Witt's bladder was removed by Dr. Sayers who, according to Witt's affidavit, "discovered that my back had been broken in two places (two broken vertebrae), . . ." and told him that the broken vertebrae were "quite probably related to the automobile accident of October 28, 1975." Witt alleges that, in signing the release, he acted under the mistaken belief that the only injury sustained in the accident was to his ribs and that, had he known of the broken vertebrae, he would not have executed the document.

Rauch indicated in his deposition that from what Witt and Dr. Jones had told him, he could not be sure whether Witt's internal problems were related to the accident or not. In his conference with Witt, Rauch could recall no mention of a back injury. Rauch did say he believed that there was something "unknown as to the exact nature, . . . extent . . . [and] cause of all Mr. Witt's medical problems." In his opinion, the possibility of unidentified problems entered into the settlement. The trial judge concluded that there was a unilateral mistake of fact on Witt's part as to the nature of his injuries when he signed the release, but that there was no such mutual mistake as would render the release unenforceable.

As might be anticipated, there are a vast number of cases raising the issue of whether releases for personal injuries are enforceable under varying circumstances.[2] Generally, a release may be avoided for fraud or mutual mistake of fact.[3] The traditional approach is summarized by Williston as follows:

A release though general in terms will be reformed so as to cover merely the right with regard to which the parties were dealing and exclude rights of which they were ignorant. This principle has sometimes been extended so as to exclude from the operation of a release unknown or unexpected consequences of a known right to which the release applied and was intended to apply. Thus, where a release is given by one injured in an accident and more serious injuries develop than were supposed to exist at the time of the settlement, it is a question of

---

1. In oral argument on the motion for summary judgment, Witt's attorney denied that Witt had conferred with an attorney prior to settlement, but no counter-affidavit was filed so that, for purposes of summary judgment, Mr. Rauch's affidavit must be accepted.

2. *See* annotations at 117 A.L.R. 1022; 164 A.L.R. 402 and 71 A.L.R.2d 82.

3. *See* Note 8, Creighton L.Rev. 30, 35–36 (1974) by William D. Artus, attorney for appellant herein. The note focuses on *Swartz v. Topping*, 191 Neb. 41, 213 N.W.2d 718 (1974).

fact whether the parties assumed as a basis of the release the known injuries, or whether the intent was to make a compromise for whatever injuries from the accident might exist whether known or not. On a fair interpretation not only of the language of the instrument, but of the intention of the parties, the latter supposition is more likely, but presumably out of tenderness for injured plaintiffs some courts have gone very far in finding the facts in accordance with the former possibility. Equity will reform or rescind in a direct proceeding a release given for accidental injuries, but the more common recognition of the equitable principle that a release will be avoided in case of an injury unknown at the time of settlement occurs where the release is avoided in an action at law brought to recover damages for the injury. (footnotes omitted)[4]

Except where the mistake is known to the other party to the transaction,[5] Williston criticizes extending relief for a unilateral mistake because of its contradiction of the objective theory of mutual assent in the formation of contracts.[6] If one views the parties to the contract from the standpoint of objective reasonable parties, one cannot consider the subjective mistake of fact under which one of the parties was laboring, where the other party is unaware or has no reason to be aware of such a mistake. Judge Frank, in his perceptive concurrence

in *Ricketts v. Pennsylvania R. Co.*, 153 F.2d 757, 765 (2d Cir. 1946), criticizes this artificial test and points out that some courts have abandoned the "objective" test, saying boldly that a non-negligent unilateral mistake justifies cancellation or rescission of a contract.[7] Similarly, Wigmore indicates that the modern trend is not to lay down rules of thumb but to develop a special doctrine liberally relieving the party who has signed the release.[8]

It should make little difference whether or not the releasor, alone, was laboring under a mistake as to his physical or mental condition at the time of executing a release. If all the circumstances are fully revealed to him before signing, he should have essentially the same information as the releasee. When the mistake is of substantial consequence, it would seem that relief should be afforded in the absence of persuasive reasons to the contrary.

■ Obviously, the preservation of agreements entered into in good faith and the encouragement of settlement of disputes constitute strong arguments for enforcing releases. We believe that these interests may still be preserved without adhering to rigid formulas dependent upon whether mistakes are unilateral or mutual.

■ The test should be whether, at the time of signing the release, the releasor

---

**4.** 5 Williston on Contracts, § 1551 at 4347–49 (1937).

**5.** *Id.* § 1573 at 4399. Williston also excepts cases where the one against whom relief is sought is a volunteer or where there is a non-negligent mistake in executing the instrument.

**6.** *Id.* § 1579 at 4412. But in most cases of unilateral mistake, the other party is aware of that fact. If the party seeking the release knows the true nature of the releasor's injuries and withholds that information, fraud may be found. *See* cases cited in 71 A.L.R.2d 133–35.

**7.** Judge Frank cites *Rosenblum v. Manufacturers Trust Co.*, 270 N.Y. 79, 200 N.E. 587, 105 A.L.R. 947 (1936); *Meade v. Brown*, 218 Mich. 556, 188 N.W. 514 (1922); *In re Clark's Estate*, 233 App.Div. 487, 253 N.Y.S. 524 (1931); *Harper, Inc. v. City of Newburgh*, 159 App.Div. 695, 145 N.Y.S. 59 (1913); *City of New York v. Seely-Taylor Co.*, 149 App.Div. 98, 133 N.Y.S.

808, 811 (1912), *affirmed on opinion below*, 208 N.Y. 548, 101 N.E. 1098 (N.Y.1913); *Seidman v. New York Life Ins. Co.*, 162 Misc. 560, 296 N.Y.S. 55, 56 (Sup.Ct.1937). Although Judge Frank found significance in the fact that the releasor in *Ricketts* was an employee of the defendant railroad, 153 F.2d at 768–69, we do not believe the reasoning of his concurrence is limited to such situations. The relative bargaining position of the parties is one factor to be considered, *see* discussion *infra*; but an employer/employee relationship is not determinative. *See, e. g., Ranta v. Rake*, 91 Idaho 376, 421 P.2d 747, 751 (1966), and *Clancy v. Pacenti*, 15 Ill.App.2d 171, 145 N.E.2d 802, 805 (1957). Both of these cases involved automobile accidents where releases were set aside, referring to Judge Frank's concurrence.

**8.** 9 Wigmore on Evidence, § 2416 at 55 (3d ed. 1940).

intended to discharge the disability which was subsequently discovered. Relevant to the determination of this question are all of the facts and circumstances surrounding execution of the release. Also relevant to the determination is whether a reasonable person in the position of the releasor under the circumstances then existing would have had such an intent.[9]

In enunciating this test, we deliberately have not preserved the additional artificial distinction between cases involving a known injury which proves to be much more serious than believed, and an injury different in type from that originally known. In some cases where the injury is of a different type, it may be no more disabling than originally anticipated, whereas a known injury may initially be believed to be innocuous and later prove to be totally debilitating.

There may be three types of mistakes with reference to an injury.[10] First, there may be a mistake as to the fact of injury. A release may be signed by a party believing that property damage only was sustained, whereas later it becomes apparent that a physical injury was suffered. Second, there may be a mistake as to the character of the injury. One could believe that he had an injury only of his ribs, whereas later, a fracture of vertebrae might be discovered. Third, there may be a mistake as to the extent of injuries. For example, one could believe he has but a mild knee injury which later proves to be crippling. In many cases, there may be an overlap between the second and third categories, dependent upon the accuracy of the diagnosis. A knee injury may appear to be a mild ligament strain and prove to involve a ruptured cartilage. One analysis could consider the difference as one of degree;

another could consider the difference as one of fundamental character.

To an extent, such an ambiguity is presented here. Witt complained of pain in his back which could have been related to the accident, although not believed by the doctor to be so related. It is now indicated that he suffered fractured vertebrae in the accident. This may be regarded as a difference in the extent of his back injuries or as a different character of injury.

Niceties of distinction between the extent of a known injury or a difference in the character of the injury should not be determinative.[11] In either event, the decision as to whether the release is enforceable should hinge on whether the releasor, at the time of signing the release, intended to discharge the disability which was subsequently discovered.

A party may very well enter into an agreement contemplating the possibility that his condition may substantially worsen in the future, but hoping that it will not. The occurrence of the worsening condition under those circumstances is not a basis for disregarding the release. As Corbin states:

> If a claim is made for damages for an injury, a compromise settlement is ordinarily not made voidable for mistake because the injury was greater and lasted longer than was expected at the time of the settlement, if the parties knew or had reason to know that the extent of the injury was uncertain and that was the very reason for the compromise. (footnotes omitted)[12]

■■ Once the party relying on a release establishes that it was given with an understanding of the nature of the instru-

9. Our test is similar to that enunciated in *Ranta v. Rake*, 91 Idaho 376, 421 P.2d at 573. *See also, Finch v. Carlton*, 84 Wash.2d 140, 524 P.2d 898, 900–01 (1974); *Casey v. Proctor*, 59 Cal.2d 97, 28 Cal.Rptr. 307, 378 P.2d 579, 588–89 (1963); *Clancy v. Pacenti*, 15 Ill.App.2d 171, 145 N.E.2d at 805.

10. "Cady v. Mitchell, A New Look at the Personal Injury Release in Pennsylvania," 28 U.Pitt.L.Rev. 109, 111 (1966).

11. A great difference in degree may be more important than a difference in kind. 6 Corbin on Contracts, § 1292 at 183 (1962).

12. 6 Corbin on Contracts, § 1292 at 181–82 (1962).

ment,[13] the burden is on the releasor to show by clear and convincing evidence that the release should be set aside.[14] Factors that may be considered [15] are the manner in which the release was obtained—including whether it was hastily secured at the instigation of the releasee; whether the releasor was at a disadvantage because of the nature of his injuries; whether the releasor was represented by counsel; whether he relied on representations of the releasee or a physician retained by the releasee and whether liability was seriously in dispute. The relative bargaining positions of the parties [16] and the amount to be paid should also be considered.

In applying these criteria to the facts in this case, we agree with the trial judge that there is no evidence of any coercion or fraud, nor does it appear that the release was hastily entered into or even induced by the insurance company. Moreover, Witt indicated to Rauch that he was represented by counsel.

The sole issue regarding summary judgment was whether there was a mistake so as to justify not enforcing the release. Even if we were to adhere to the mutual mistake requirement, we cannot agree that on the basis of the evidence presented on the motion for summary judgment that it can be said as a matter of law that no mutual mistake existed. Here, it is not disputed that Witt had no knowledge at the time of executing the release that he had incurred an injury involving fractured vertebrae. While Mr. Rauch's testimony was not as clear, a factual issue was presented as to whether he was laboring under a mistake as to Witt's back injury. Under

our view of the law, however, it is immaterial whether any such mistake was unilateral or mutual.

The focal and difficult question presented is whether the condition caused by the fractured vertebrae was a category of disability intended to be discharged by Witt at the time he signed the release. Here, both parties were aware that Witt was suffering from internal problems which, while not likely to have been caused by the collision, could have been attributable to it. The settlement was probably made in part with this in mind. A question is presented as to whether the fractured vertebrae caused any increased disability, and particularly, as to whether such disability, if any, was of a type substantially different from the possibilities of disability considered by Witt at the time he signed the release.

The parties have argued the case to the court below and to us on the former standard of whether there was a mutual mistake. Since we believe that a factual issue was presented on that question, we hold that the trial court was in error in granting summary judgment. Additionally, the trial court, without a controlling decision applicable, quite understandably followed the rule of law under which releases could not be avoided for unilateral mistake.

Since this is our first opportunity to pass on the issues, we normally would deem it advisable to remand the case to the superior court for the purpose of ascertaining whether the nature of Mr. Witt's disability, if any, resulting from the fractured vertebrae is of such character that Witt did not intend that it be discharged at the time of signing the release.[17] A remand in the

---

13. 71 A.L.R.2d 82, 172.

14. 71 A.L.R.2d 82, 172; *Lion Oil Ref. Co. v. Albritton*, 21 F.2d 280, 282 (8th Cir. 1927); *Ranta v. Rake*, 91 Idaho 376, 421 P.2d at 752; *Fraser v. Glass*, 311 Ill.App. 336, 35 N.E.2d 953, 956 (1941).

15. *See generally, Schmidt v. Smith*, 216 N.W.2d 669, 673 (Minn.1974); *Casey v. Proctor*, 378 P.2d at 589.

16. A much more liberal rule applies in cases of personal injury releases involving seamen be-

cause of their relatively poor bargaining position. *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239, 245 (1942). It has also been suggested that releases executed by employees should be more readily set aside for this reason. *Ricketts v. Pennsylvania R. Co.*, 153 F.2d 757, 760 (2d Cir. 1946) (Frank, J., concurring).

17. The court would also consider whether Mr. Witt entered into the settlement in contemplation that his disability might prove to be much more serious than indicated when the

instant case is unnecessary, however. Subsequent to the drafting of this opinion, we have been informed that the parties have settled their dispute. While our holding[18] will not, therefore, affect the litigants at bar,. we deem the issues of sufficient importance to justify publication of this opinion.[19]

release was signed and the other factors enumerated, *supra.*

18. The peculiar nature of releases for personal injuries warrants a single treatment since we are concerned with the human mind and body and not an article of commerce. Mistakes are made, and the consequences thereof cannot be appraised as in matters involving property or services. Thus, our holding is limited to contracts involving releases of liability in personal injury cases and has no application to issues of mistake in commercial transactions. *See Clancy v. Pacenti, supra.*

19. We have previously stated that mootness is "a matter of judicial policy, not constitutional law." *R.L.R. v. State,* 487 P.2d 27, 45 (Alaska 1971). Where a resolution of a particular question is of significant public interest, we may, in our discretion, resolve it despite the fact that the parties have settled their dispute. In *Liberty Mutual Insurance Co. v. Fales,* 8 Cal.3d 712, 106 Cal.Rptr. 21, 505 P.2d 213, 215 (1973), the Supreme Court of California resolved a question concerning the right of an insurance company to pursue a subrogated claim under the terms of an uninsured motorist clause in an insurance policy, even though the judgment entered by the trial court had been satisfied. The court stated: "It is evident that the question at bar involves a matter of continuing public interest." *Id.* 106 Cal.Rptr. at 23, 505 P.2d at 215. *See also, Leonard v. City of Bothell,* 87 Wash.2d 847, 557 P.2d 1306, 1308 (1976); *Hartman v. Washington State Game Commission,* 85 Wash.2d 176, 532 P.2d 614, 615 (1975); *Leak v. High Point City Council,* 25 N.C.App. 394, 213 S.E.2d 386, 388–89 (1975); *In re Recall of Certain Elected Officials, City of Delafield,* 63 Wis.2d 362, 217 N.W.2d 277, 279 (1974); *City of Albuquerque v. Campos,* 86 N.M. 488, 525 P.2d 848, 851 (1974); *Maguire v. Fulton,* 179 N.W.2d 508, 509–10 (Iowa 1970); *Arizona Osteopathic Medical Association v. Fridena,* 105 Ariz. 291, 463 P.2d 825, 826, *cert. denied,* 399 U.S. 910, 90 S.Ct. 2201, 26 L.Ed.2d 562 (1970); 132 A.L.R. 1185.