**Steven HELSTROM, Appellant,**

v.

**NORTH SLOPE BOROUGH, Appellee.**

No. S–2900.

Supreme Court of Alaska.

Aug. 24, 1990.

Scott L. Taylor, Hoppner & Paskvan, P.C., Fairbanks, for appellant.

Lawrence L. Hartig and Nancy S. Schierhorn, Hartig, Rhodes, Norman, Mahoney & Edwards, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

At issue is whether a settlement agreement between Steven Helstrom and the North Slope Borough is voidable by Helstrom for duress and unconscionability. The superior court granted summary judgment in favor of the Borough. We reverse.

## 1. FACTS AND PROCEEDINGS

According to Helstrom, he started working for the North Slope Borough as a mechanic about August 20, 1984. His hourly wage was $20.89, "and [he] was scheduled for a forty hour week." Four days after he started, Helstrom was promoted to chief mechanic and his hourly wage increased to $23.18, and his "hours were increased to nine hours per day for a six day work week." He was promoted to the position of foreman about March 4, 1985, at an hourly wage of $27.33, with a nine hours per day, six-day work week. His supervisor as foreman was James Kennedy.

Before starting to work for the Borough, Helstrom had worked as a master mechanic for about eleven years. During that time Helstrom acquired several thousand dollars worth of tools and equipment. In 1980 he conducted an inventory of these items, estimating them to be worth $17,348.60. Helstrom later acquired an unspecified amount of additional tools. Helstrom took all of his tools with him when he went to work for the Borough. According to Helstrom, the Borough did not supply tools for the mechanics it employed; rather it required them to bring and use their own on the job. Helstrom allowed his co-workers to borrow his tools as needed. According to Helstrom, some of his tools became broken, lost or stolen during the course of his employment. Helstrom claims that the Borough had a policy of replacing such privately owned tools, and that those lost were replaced. He denies ever stealing any tools from the Borough.

When Helstrom started to work for the Borough, "the shop was a wreck, with many vehicles down and unserviced." He worked "numerous hours putting the fleet back in service" over a course of five or six months, hours for which he "was never paid." Kennedy, however, allegedly told him that he "would get paid eventually." All overtime Helstrom worked in 1984 was believed by Helstrom to be "legitimate."

The same cannot be said of all overtime worked by Helstrom in 1985. Between July and October of 1985, Helstrom admits to charging the Borough 112 "bogus" overtime hours, with the cooperation of Kennedy. Helstrom was uncertain whether an additional 52 hours of overtime were earned or not. In monetary terms, this multiplies out to (at least) $4,590.88 at Helstrom's overtime rate. Assuming the 52 additional hours were also not earned, the total becomes $6,722.36.

In October 1985 Kennedy was arrested in Anchorage for the possession and sale of cocaine. Helstrom testified at grand jury proceedings involving Kennedy. Helstrom, in his affidavit, alleges that Kennedy subsequently "fabricated a story that [Helstrom] was stealing tools from the Borough" for use by Quamun Enterprises, a business Helstrom was running on the side. The Borough police, in response, obtained a search warrant. The warrant authorized the seizure of "tools and equipment and attachments, and storage facilities as specified in ATTACHMENT A...." Rather than limit their seizure to tools listed in the attachment to the warrant, the Borough police allegedly simply cleaned out Helstrom's shop, taking more tools than the warrant authorized. Helstrom, in his affidavit, testified that this left him unable to operate his side business and cut it off as a potential source of income.

Between April 1, 1985, and January, 1986, Helstrom rented an apartment from the Borough for $695 per month. Borough records show that Helstrom made only one rent payment, leaving $5,695 unpaid. A second rent check "bounced." Helstrom, by affidavit, claimed however that "[a]lthough I was behind in my apartment rent, I made more than one payment, and money was deducted from my payroll checks." Helstrom also claimed entitlement to an offset against any back rent of "at least $4,500," based on "overpayments [he] made to the Borough for the rental of substitute housing when the housing that was promised to [him] at a cost of $695.00 per month was not available and [he] had to rent alternate housing at the cost of $1,250.00 per month. This began in mid-September, 1984, and went until the end of April, 1985."

On January 2, 1986, Helstrom attempted to withdraw money from his "thrift plan." The "thrift plan" is a form of supplemental employee benefit account, requiring the Borough's counter-signature before funds may be withdrawn. Helstrom intended to use the money to go to Fairbanks to hire an attorney to defend himself against the looming tool theft charges. The money was not forthcoming.

On January 4, 1986, Helstrom went to the Borough police and gave a statement concerning his overtime padding scheme.[1]

Early in February 1986 Helstrom was suspended from his job with the Borough for thirty days without pay, apparently as a result of his overtime padding. Sometime later in the month Helstrom went to Borough Attorney David Weber's office. At this point no civil or criminal action had been filed against Helstrom. At this meeting, Weber claims that he summarized for Helstrom the various claims that he felt the Borough had against him:

1. A claim for overdue rent in "the amount of $5,695.00."

2. A claim for the allegedly misappropriated tools "exceed[ing] $3,000."

3. A claim for unjustified overtime, which amounted to "approximately $17,000." Weber was of the view that pursuant to Borough personnel rules, Helstrom was a supervisory employee and not entitled to any overtime unless "specifically authorized in writing by the mayor." There is no evidence of such written authorization in the record.

4. "A claim for payment for tool boxes for Mr. Helstrom and another employee. The cost of these tool boxes were [sic] charged to the Borough but the Borough was never reimbursed for them. Monies were paid to Mr. Helstrom to reimburse the Borough for the purchase of a tool box and tools for the other employee, but the monies were never received by the Borough. I believe the cost of the tool boxes was at least $2,600."

Weber also claims that a preliminary agreement to settle the Borough's claims against Helstrom was reached at this meeting. The Borough would "reduce" the amount of its claims against Helstrom, in exchange for which Helstrom would resign and pay the Borough "about" $12,000 for excess overtime, back rent, and tool box reimbursement. This amount was to be paid out of Helstrom's last pay check and from his "thrift plan." Helstrom was to "immediately" request the release of the money from his thrift plan. Helstrom, however, denies that any agreement was reached at this first meeting, and specifically denies that he authorized Weber to withhold his "thrift plan" money.

Weber claims that Helstrom never appeared as though he was under duress at any of their meetings.

On February 27, 1986, Weber went to the thrift plan office to see if Helstrom had requested that the money be released. Helstrom had requested the money (apparently back in January, *see supra*), but the check had not yet been countersigned by the Borough. Weber instructed the Borough not to countersign "per the agreement with Mr. Helstrom."

About two hours later, Helstrom went to Weber's office and demanded that his thrift plan money be released. According to Weber, Helstrom said he wanted the money because "he had other debts he wanted to pay before he left Barrow." Weber refused, citing their oral "agreement."

Later that same day, Weber received a call from attorney Scott Taylor, who he says "represented himself" as Helstrom's attorney, repeating the demand to release Helstrom's thrift plan money. Again Weber refused. Helstrom's version is that he called Taylor that day, and that Taylor contacted the Borough "on [his] behalf." Taylor also agrees that he called "on behalf of" Helstrom.

---

1. Borough Attorney David Weber states in his affidavit that Helstrom was also interviewed regarding the alleged misappropriation of tools, but the document he cites is an interview with another Borough employee.

On February 28, 1986, the Borough filed a civil suit against both Helstrom and Kennedy. The complaint alleged that Helstrom, after giving credit for payments made and payroll deductions, owed $5,558.20 in back rent. It also alleged that Helstrom was a salaried employee and not entitled to any overtime, and that Helstrom had received unspecified amounts of overtime to which he was not entitled. The complaint further alleged that Helstrom had ordered and received a tool box on the Borough's account and converted it to his own use. Finally, it alleged that Helstrom had converted Borough tools and supplies to his own use. Damages were alleged to be "in an amount to be determined at trial, but in excess of $40,000" for both Helstrom and Kennedy. The complaint also sought punitive damages in excess of $100,000, based on the allegedly fraudulent aspects of Helstrom's and Kennedy's conduct.

The Borough moved for an ex parte writ of attachment "of the accounts, monies, possessions, property, assets and wages" of Helstrom on the same day, February 28, pursuant to Civil Rule 89(m)(2)(iv)–(v), (4) and AS 09.40.010. The writ was promptly issued that day.

February 28 was a Friday. Helstrom was served with the writ. According to Helstrom, he was "requested to turn over anything of value, and [he] was informed by the officers that anything [he] purchased, such as a plane ticket, would be subject to execution." Helstrom went to the Markair ticketing counter at the Barrow airport, where a Markair agent, Carol Thomas, allegedly informed him that "she could not let me on a plane without permission from David Weber." Helstrom believed that any plane ticket he bought would be seized. Weber recalls "someone at Markair" asking him during this period whether an airline ticket could be seized pursuant to the writ. He also recalls Helstrom asking him the same question. Weber claims that his answer was that the Borough had "no intent to seize any airline ticket of Mr. Helstrom's, or otherwise prevent him from coming to or going from Barrow of his own free will."

Over the weekend Helstrom learned from Taylor, who had spoken with Helstrom's family, that his youngest daughter was in the hospital with pneumonia. "The doctors were afraid that she was going to die from the illness." Taylor's version is that he told Helstrom "that the doctors feared her condition was deteriorating" and "that he needed to get into Fairbanks as quickly as possible."

The next Monday Helstrom again visited Weber's office. According to Weber, Helstrom insisted that everything be settled so that he could leave Barrow. Weber informed Helstrom that Taylor had called previously and represented himself as Helstrom's attorney. Weber then called in another Borough attorney, Merrill Lowden, and explained "in detail" the ethical problems involved in negotiating a settlement with a person represented by counsel. Helstrom denied that he was represented by counsel and said that he did not wish to be. Weber then drafted the three-page written settlement agreement at issue in this appeal. Weber claims that he "reviewed the agreement in detail with Mr. Helstrom, explaining to him that [Weber] was the attorney for the North Slope Borough and was representing only [the Borough], not Mr. Helstrom...." Helstrom signed the agreement the next day, and his signature was notarized.

Under the terms of the settlement, Helstrom "confesse[d] judgment in favor of the North Slope Borough in the sum of $20,000." Helstrom authorized the Borough to cash his Public Employee's Retirement System Refund, "thrift plan," and other checks and retain $15,007.38 thereof. Helstrom also transferred his interest in the tools seized by the Borough to the Borough and released any claims against the Borough he may have had in connection with their seizure. These tools and claims are valued in the settlement at $4,992.62. Helstrom agreed to resign from his job "in lieu of termination...." The agreement "forever release[d] and settle[d] any and all claims [Helstrom] has, may have, or may come to have against the [Borough]...."

The settlement also contained a "liquidated damages" clause providing that "should [Helstrom] breach any part of this agreement the sum of $20,000.00 will be forfeited to the North Slope Borough as liquidated damages for the breach … and the [Borough] will be free to press the claims settled herein." Helstrom also agreed to "indemnify, hold harmless, and defend the [Borough] against any and all claims [Helstrom] may have against the [Borough].

In exchange for the foregoing, the Borough agreed to settle the claims asserted in its complaint.

Helstrom claims, however, that he signed the settlement because he "did not see any option available to [him] under the circumstances." The combination of the seizure of his tools and suspension without pay allegedly left Helstrom with "no source of income whatsoever."

Given that I had no accessible and disposable money, that I had no source of revenue, that any property I might acquire was subject to a Writ of Execution, that I had no access to legal counsel in Barrow, Alaska, that the North Slope Borough had filed a civil suit against me seeking substantial damages, that there were pending criminal charges brought against me, and that to the best of my knowledge my youngest daughter was sick and possibly dying in a hospital in Fairbanks, Alaska, I felt that I had no choice but to sign the Confession of Judgment. No reasonable alternatives were left to me because I had no money, no counsel, and no time to stay in Barrow to fight a protracted legal battle under the circumstances. With regards to any "agreement" I had with the North Slope Borough pursuant to the document entitled "Settlement, Release and Confession of Judgment," I had no intention of abiding by this agreement, and upon my return to Fairbanks, I immediately retained counsel and moved to have the entire "settlement" set aside.

Despite his assertion that he had "no money," Helstrom, after signing the settlement, "barely made the flight out of Barrow to Fairbanks." It appears that Helstrom borrowed the money for the plane ticket from friends. On arrival Helstrom "immediately" formally retained Taylor as counsel.

The next day, March 5, the Borough, on the basis of the settlement agreement, moved for judgment. Judgment was entered on March 6. On March 27 Taylor, on behalf of Helstrom, moved to set aside the judgment under Civil Rule 60(b), alleging that it was executed under duress.

The superior court granted Helstrom's motion under Civil Rule 60(b)(6). See Gravel v. Alaskan Village, Inc., 423 P.2d 273, 274–75 (Alaska 1967) (duress and coercion within the ambit of 60(b)(6)). The trial court found that "Helstrom's lack of access to an attorney and his perception of his family and financial situation provide an adequate showing that he was under duress when he signed the confession of judgment." The trial court then vacated the judgment, but allowed the litigation to continue, giving Helstrom 20 days to answer the complaint.

In response, the Borough amended its complaint. The amended complaint set the damages resulting from the various claims discussed above at "in excess of $30,000," plus punitive damages. It also added a cause of action for breach of the settlement agreement, which the Borough claims occurred when Helstrom moved to set it aside on grounds of duress. The Borough claimed that this breach entitled it to $20,000 in "liquidated damages," plus costs and fees, pursuant to the settlement.

The Borough moved for summary judgment, seeking to have the settlement agreement specifically enforced. The Borough argued that even taking the facts in the light most favorable to Helstrom, he was not entitled to relief for duress.

The superior court granted the Borough's motion. The superior court held that duress would void the settlement only if Helstrom could show that he had "no reasonable alternative to agreeing to the other party's terms, or as it is often stated, that he had no adequate remedy if the threat were carried out." Totem Marine

*Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.,* 584 P.2d 15, 22 (Alaska 1978). The superior court then held that even taking the facts in the light most favorable to Helstrom, he had failed to show sufficient duress. The court found that "the most troubling aspect ... was that [Helstrom] thought that any airline ticket he purchased would be confiscated by the Borough pursuant to the prejudgment writ of attachment." The court found it "significan[t]", however, that "Helstrom never consulted with the Fairbanks attorney he consulted by phone to see if the writ actually could include seizure of his air ticket." Nor did Helstrom call Taylor to get his advice about signing the settlement before doing so. Thus, the court found that "[e]ven considering the illness of Helstrom's daughter, under these circumstances Helstrom has not shown that he had no available remedies that could have been used to promptly remove this perceived inability to physically leave Barrow." The court added that "[Helstrom] had the financial ability to leave Barrow and retain the attorney without access to the Thrift Plan checks or other income in Barrow: he did so immediately after signing an agreement that did not allow access to the thrift plan checks."

The superior court rejected the argument that the Borough's seizure of Helstrom's tools and attachment of his "thrift plan" money constituted duress. The court noted that Helstrom could avail himself of Criminal Rule 37(c) to replevy any tools wrongfully seized. Additionally, the court held that the seizure of Helstrom's "thrift plan" monies by pre-judgment writ was lawful, designed "to enforce good faith legal claims of the Borough," and that "Helstrom had available remedies under the civil rules to request release of these funds from the court."

The superior court also rejected Helstrom's argument that the settlement agreement was not supported by adequate consideration.

Helstrom appeals.

## II. DISCUSSION

### A. STANDARD OF REVIEW.

On appeal from a grant of summary judgment, the question is whether there is a genuine issue of material fact and whether the moving party is entitled to judgment on the established facts. *E.g., Sea Lion Corp. v. Air Logistics of Alaska, Inc.,* 787 P.2d 109, 116 (Alaska 1990). All reasonable inferences of fact from proffered materials must be drawn against the moving party and in favor of the non-moving party. *Id.*

### B. SUMMARY JUDGMENT WAS IMPROPERLY GRANTED AGAINST HELSTROM'S DURESS CLAIM.

In *Totem Marine,* 584 P.2d at 21–23, we held that there are three elements to be satisfied before a contract can be voided for duress: "1) one party involuntarily accepted the terms of another, 2) circumstances permitted no other alternative, and 3) such circumstances were the result of coercive acts of the other party." *Id.* at 21. The burden is on the party seeking to void the contract to show these elements by clear and convincing evidence. *Schmidt v. Lashley,* 627 P.2d 201, 204 (Alaska 1981).

The first two prongs of *Totem Marine* are met if the challenging party believed that he "had no reasonable alternative to agreeing to the other party's terms, or, as it is often stated, that he had no adequate remedy if the threat were to be carried out." *Totem Marine,* 584 P.2d at 22. "What constitutes a reasonable alternative is a question of fact, depending on the circumstances of each case." *Id.* "An available legal remedy ... may provide such an alternative." *Id.* "[T]he adequacy of the remedy is to be tested by a practical standard which takes into consideration the exigencies of the situation in which the alleged victim finds himself." *Id.* (citations omitted). However, "[a]n available alternative or remedy may not be adequate where the delay involved in pursuing the remedy would cause immediate and irreparable loss to one's economic or business interest." *Id.* The belief must be held subjectively;

the reasonableness of the alternatives is to be judged objectively.

The "coercive acts" prong has been liberally construed, requiring that the strained circumstances be the result of acts which are criminal, tortious, or even merely "wrongful in the moral sense." *Id.; Wassink v. Hawkins,* 763 P.2d 971, 974 (Alaska 1988).

When the contract sought to be avoided is a settlement of litigation, relevant considerations also include "the manner in which the release was obtained, including whether it was hastily secured at the instigation of the releasee, whether the releasor was represented by counsel, and whether he relied on representations of the releasee. Finally, the relative bargaining positions of the parties should be weighed." *Schmidt,* 627 P.2d at 204 n. 8.

■ Taking the facts and reasonable inferences therefrom in the light most favorable to Helstrom, we conclude that summary judgment was improper on Helstrom's duress claim.

Most of Helstrom's duress allegations focus on the various acts of the Borough which had the effect of depriving him of income. Helstrom claims that the deprivation of his income interfered with his ability to retain counsel and visit his sick daughter. These acts by the Borough, however, did not interfere with Helstrom's ability to leave Barrow or retain counsel, since Helstrom's execution of the settlement agreement did not free up any of these sources of income lost due to arguable Borough actions. The settlement transfers the rights to these potential sources of income to the Borough. Yet without these funds, Helstrom flew out of Barrow immediately after signing the settlement and formally retained Taylor as his attorney. Thus, these acts by the Borough did not by themselves deprive Helstrom of his ability to leave Barrow or retain Taylor in this fashion.

A far different case is presented by Helstrom's claim that, money aside, he believed that he could not get a plane ticket out of Barrow to see his sick daughter until he settled with the Borough. According to Helstrom's affidavit, the Borough police officers who served Helstrom told him "that anything I purchased, such as a plane ticket, would be subject to execution." The Markair agent allegedly told Helstrom not merely that a ticket might be subject to execution under state law, but rather the specific fact that *"she could not let me on a plane without permission from David Weber."* (Emphasis added). Although Weber contradicts Helstrom's assertion, for purposes of summary judgment factual disputes must be resolved in the non-movant's favor. *Sea Lion,* 787 P.2d at 116.

The involuntariness prong of duress is a subjective test. The question is not whether a "reasonable" person's will would have been overcome; the question is whether Helstrom's was. *Totem Marine,* 584 P.2d at 21. Given that Helstrom believed that he could not leave without settling with the Borough and that he has adduced a factual basis for this belief, a material question of fact remains as to the "involuntariness" prong of *Totem Marine.*

We conclude that Helstrom has adduced sufficient evidence from which a trier of fact could reasonably find that Helstrom had no other reasonable alternative than to settle. Neither party disputes that the only practical way to get from Barrow to Fairbanks in early March is to fly.

Arguably Helstrom may have had alternatives to signing the settlement in order to obtain a ticket which would not be seized. Helstrom could have asked Weber if he was going to seize any ticket. Alternatively, Helstrom could have attempted to buy a ticket and see if it would have been seized. Helstrom could have also called Taylor and asked him his advice. However, a trier of fact might reasonably find that these options would have been futile, and thus not reasonable. The writ of execution was broad enough to cover plane tickets. According to Helstrom, Weber had already stated that his permission would be required to leave town. Previous pleas by Taylor on Helstrom's behalf had been unavailing.

Moreover, the adequacy of these alternatives must be measured by a practical standard taking into account the extreme exigencies of the situation. Helstrom's daughter was seriously ill and it was his perception that he had to get to Fairbanks promptly. Given this as well as his belief that he could not do so without settling, Helstrom was in a much weaker bargaining position, a factor weighing in favor of voiding the settlement. *Schmidt*, 627 P.2d at 204 n. 8. Also, the fact that Helstrom was not represented at the settlement's execution weighs in favor of voiding the settlement. *Id.*

Finally, again taking the facts most favorably to Helstrom, the Borough caused his plight through acts that were tortious or at least "wrongful in the moral sense." *See Totem Marine*, 584 P.2d at 22.

If Weber knew that Helstrom was trying to leave Barrow and, by procuring the aid of the airlines, prevented his only reasonable means of departure, Helstrom might have a claim sounding in false imprisonment. Indeed, Helstrom eventually counterclaimed against the Borough for false imprisonment. The Markair agent, apparently after having spoken to Weber, allegedly told Helstrom that he couldn't leave without Weber's permission. Weber admits talking to the Markair agent about the subject, but denies that he intended to prevent Helstrom from leaving.

"An actor is subject to liability for false imprisonment if (a) he acts intending to confine the other or a third person within boundaries fixed by the actor and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." Restatement (Second) of Torts § 35(1) (1965). *Cf. Hazen v. Municipality of Anchorage*, 718 P.2d 456, 461 (Alaska 1986) (elements of false arrest are "(1) a restraint upon plaintiff's freedom (2) without proper legal authority.")

Taking the facts most favorably to Helstrom, as we must for purposes of summary judgment, *Sea Lion*, 787 P.2d at 116,[2] the deprivation of a plane ticket at the instigation of the Borough, effectively preventing Helstrom from leaving Barrow, sufficiently confined him.[3] Restatement (Second) of Torts § 36, comment b, illustration 6 & 7; *see also Allen v. Fromme*, 141 A.D. 362, 126 N.Y.S. 520, 520–21 (1910) (defendant liable for causing sheriff to restrain plaintiff from leaving New York City to prevent plaintiff from evading a meritless debt claim). Helstrom lacked other practical means of leaving. *Cf. Whittaker v. Sandford*, 110 Me. 77, 85 A. 399, 402 (1912).

Nor, taking the facts most favorably to Helstrom, did the Borough have proper legal authority to so confine him. Helstrom had been suspended from his job without pay and was apparently not otherwise earning regular income. Former AS 09.38.-030(b) provided that under such circumstances Helstrom was entitled to an exemption of $700 per month in his liquid assets. The writ, which we note was a form writ prepared and submitted by the Borough, extends to all of Helstrom's assets, without excluding statutorily exempt property. The writ could not lawfully have seized so much of Helstrom's assets as to prevent him from leaving town. In summary, material questions of fact remain as to Helstrom's duress claim.

## C. HELSTROM'S UNCONSCIONABILITY CLAIM.

■ In *Vockner v. Erickson*, 712 P.2d 379, 381–83 (Alaska 1986), we adopted the Restatement (Second) of Contracts § 208 standard of unconscionability. *Id.* at 381; *see* Restatement (Second) of Contracts § 208 (1981). "The Restatement does not provide an explicit definition of unconscionability. It does identify factors, however,

---

**2.** The above discussion is not a statement by this court that the Borough did indeed falsely imprison Helstrom. We merely hold that *if* the disputed facts are ultimately resolved by the trier of fact in Helstrom's favor, then Helstrom should prevail on this prong of this claim.

**3.** "A by an invalid process restrains B within limits which are coterminous with the boundaries of a considerable town. A has confined B." Restatement (Second) of Torts § 36, comment b, illustration 6.

that support a finding of unconscionability." *Id.* Factors include "weakness in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes ...," Restatement (Second) of Contracts § 208 comment a at 107 (1981); "gross disparity in the values exchanged," Restatement of Contracts § 208 comment c at 108 (1981) and "gross inequality of bargaining power...." Restatement (Second) of Contracts § 208 comment d at 109 (1981). *See also Vockner*, 712 P.2d at 381 n. 2 & 382 n. 3.

*Vockner* rejected the notion, urged by the Borough here, that both procedural *and* substantive/adequate consideration unconscionability must be present to void a contract. *Vockner*, 712 P.2d at 383 n. 8. Rather, "a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." *Id., quoting* 15 S. Williston, Law of Contracts § 1763A at 226–27 (Jaeger Ed.1972).

■ Additionally, individual terms of a contract may be unconscionable even though the contract as a whole is not. Restatement (Second) of Contracts § 208 comment e at 110 (1981); *see also Arctic Contractors, Inc. v. State*, 564 P.2d 30, 51 (Alaska 1977) (liquidated damages clause held unconscionable).

The "liquidated damages" portion of the settlement, entitling the Borough to $20,-000 should Helstrom attempt to set the settlement aside, seems unconscionable. It appears to be, as Helstrom argues, not a true liquidated damages clause but a penalty clause masquerading as one. "A valid liquidated damages clause is an agreement to set in advance damages for breach which would otherwise be difficult to determine. However, the clause may not set damages so as to penalize the breaching party for the breach, without regard to the harm caused by the breach." *Arctic Contractors*, 564 P.2d at 51. Just as in *Arctic Contractors*, the settlement agreement in this case appears to provide for "liquidated

damages" *on top of* actual damages. The settlement appears to provide for actual damages by freeing the Borough to litigate its claims against Helstrom as well as by requiring Helstrom to pay all costs and attorney's fees connected with any such litigation. It then gives the Borough $20,-000 *additional* damages. Should Helstrom move for summary judgment on this issue, we see no reason on this record why it should not be granted, barring material facts of which we are unaware.

### III. CONCLUSION

The judgment of the superior court is REVERSED and the case REMANDED for further proceedings consistent with this opinion.