Sandra L. ZEILINGER, Appellant,

v.

SOHIO ALASKA PETROLEUM
COMPANY, Appellee.

No. S–3717.

Supreme Court of Alaska.

Jan. 3, 1992.

Lee Holen, Law Offices of Lee Holen, Anchorage, for appellant.

Terrance A. Turner, Scott J. Nordstrand, Owens & Turner, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

In this appeal, Sandra Zeilinger seeks to avoid summary disposition of her wrongful discharge case against SOHIO Alaska Petroleum Company, her former employer. We affirm in part and reverse in part.

### I

Sandra Zeilinger was employed by the SOHIO Alaska Petroleum Company (SAPC) in a non-exempt clerical position [1] from March 6, 1978, to September 30, 1985. From November 1979 until the date of her termination, Zeilinger worked on the North Slope; she worked a one week on/one week off schedule, and during the weeks she was off duty she returned to Anchorage.

SAPC notified Zeilinger on August 29, 1985, that a reduction in force (RIF) necessitated her termination as of September 30, 1985. Apparently as part of this notification, SAPC offered her an "Involuntary Separation Program." This program consisted of various benefits, worth approximately $10,000; the recipient of those benefits was required to sign a separation agreement which, in part, released SAPC from any legal liability in connection with the recipient's discharge. The benefits offered Zeilinger included severance pay and three months' life and medical insurance coverage.

According to Zeilinger, the RIF came as a complete surprise. Although she was aware that SAPC and its parent, SOHIO Petroleum Company (SPC), were in the process of reorganizing, she was under the impression from "town meetings" with SAPC management that this reorganization would not affect her.

Zeilinger, along with two other non-exempt workers who had received RIF notices, met with SAPC management officials in Anchorage shortly after her RIF notification. At that meeting, SAPC denied Zeilinger's request for additional time within which to consider whether to sign the

1. Non-exempt employees were generally the clerical and secretarial support staffs. They were compensated on an hourly basis and received overtime if they worked more than their scheduled hours. By contrast, exempt employees were generally salaried professionals.

agreement, and refused to allow her to make any alterations to the agreement. According to Zeilinger, when she asked one of the management officials "if this was really a reduction in force, ... Mr. Lockard told [her] that's a question for the judge to decide or a question for the jury to decide." When she asked if her position was being eliminated, "he answered that it was for the jury to decide."

Following the meeting, Zeilinger consulted counsel, who told her that if she signed the agreement she was giving up her right to challenge it. After hearing about Zeilinger's finances, however, counsel opined that her economic situation might allow her to challenge the agreement on grounds of economic duress. Several days later, Zeilinger contacted counsel again, after learning that SAPC was inviting other employees to apply for her position. Counsel then told her that such action might also provide a ground for challenging the document, should she decide to sign it.

On September 16, 1985, Zeilinger signed the separation agreement and accepted the severance benefits offered by SAPC. According to Zeilinger, she did so because she felt her economic situation left her no choice. Even before the termination, her obligations exceeded her income by about $2,000 per month. Family medical problems made her feel that she could not forgo the medical insurance which would only be available if she signed the agreement. Moreover, there is evidence in the record from which a jury could reasonably conclude that SAPC was aware of her financial situation. When Zeilinger endorsed the check that she received as part of the separation package, she wrote on it "partial payment accepted under protest."

It is apparently undisputed that a RIF was undertaken by SAPC at the direction of its parent company. After having drawn up a list of exempt employees to be terminated, SAPC was directed on or about August 22, 1985, to further cut its North Slope staff. SAPC then decided to terminate some non-exempt personnel, including Zeilinger. SAPC decided which non-exempt employees to terminate by examining their performance ratings; Zeilinger was selected because she was considered "a marginal or poor employee within the criteria that [had been] set." SAPC concedes, however, that absent a *bona fide* RIF, it did not have cause to terminate Zeilinger based on performance alone.

Both parties agree that from the time of the RIF on September 30, 1985, to the end of 1986, the number of non-exempt employees on the North Slope first decreased, then increased. SAPC attributes the ultimate increase, "at least in part," to the integration of non-exempt employees from a sister corporation that had been closed; these employees brought with them some new job functions. Although the integration did not take place until after the beginning of 1986, a jury could reasonably conclude that, at the time they terminated Zeilinger, SAPC management was aware that the integration would take place.[2] A jury also could reasonably conclude that SAPC received more new employees as a result of the integration than it received new job functions.[3]

Three months after she was terminated, Zeilinger filed suit against SAPC to rescind the separation agreement and to recover damages for wrongful discharge. Over the next four years, the superior court granted various motions for partial summary judgment, which are discussed below. The remaining issues came on for trial by jury in October 1989. At the conclusion of the plaintiff's case, the superior court directed verdict in favor of SAPC. Zeilinger appeals.

**2.** SAPC officials testified, however, that they opposed the integration.

**3.** SAPC's president testified:
A ... One thing about the jobs that came from SCC [the sister company], they were coming with them, they were not replacing specifically SAPC. They brought with them

the job, because part of the thing we absorbed was part of the work from SCC.
Q So you['re] testifying that these were brand new jobs that were coming over from SCC and they were not taking away from existing SAPC jobs?
A Some of them.

656

## II

Zeilinger's case depends first upon avoiding summary judgment or directed verdict on her attempt to rescind the separation agreement, which contains a release clause.[4] She seeks to rescind the separation agreement on any of three theories: that SAPC obtained the agreement by misrepresenting the reason for Zeilinger's discharge; that SAPC's actions in obtaining the separation agreement breached the covenant of good faith and fair dealing implied in Zeilinger's employment agreement; and that Zeilinger involuntarily assented to the separation agreement while under economic duress.[5]

### A

To avoid enforcement of a contract on the ground of misrepresentation, a party must show four things:

First, there must have been a misrepresentation. Second, the misrepresentation must have been either fraudulent or material. Third, the misrepresentation must have induced the recipient to make the contract. Fourth, the recipient's reliance on the misrepresentation must have been justified.

*Johnson v. Curran*, 633 P.2d 994, 997 (Alaska 1981) (quoting Restatement (Second) of Contracts §§ 301–15, Introductory

Note (Tent. Draft No. 11, 1976)). Zeilinger's claim, of course, is that SAPC misrepresented the real reason for her dismissal. On this issue, the superior court granted summary judgment in favor of SAPC. The court pointed out that Zeilinger herself explicitly denied that she relied on any misrepresentation by insisting that she signed involuntarily due to her economic distress.[6]

Before this court, Zeilinger continues to insist that she signed the agreement involuntarily: "Zeilinger had no choice at the time the termination benefits were offered to her but to accept them; she feared bankruptcy, loss of her home and assets, and loss of health insurance and other benefits." Appellant's Brief at 5 (citing Zeilinger's trial testimony). Without citation or explanation, she asserts that "[i]t was error for the trial court to preclude Zeilinger's misrepresentation defense, simply because she asserted an economic duress defense, as well."

Even assuming that there are factual issues concerning the other three elements of Zeilinger's misrepresentation, she cannot avoid summary judgment unless there is also a factual issue concerning reliance. There is simply no way a jury could conclude that Zeilinger relied on SAPC's representations that a RIF was the reason for her dismissal. In addition to her explicit and continuing insistence to the

---

4. The separation agreement provided:

In exchange for the benefits described in paragraph 2, I release and discharge SAPC and its officers, directors, stockholders, employees, agents, subsidiaries, parents, and affiliates from any and all claims, demands, or liabilities whatsoever, which I ever had or may now have against any of them, including but not limited to, any claims, demands, or liabilities in connection with my employment.

I understand and expressly agree that this termination agreement extends to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, which existed at the time of the execution of this Separation Agreement.

5. We note our long-held view that "the preservation of agreements entered into in good faith and the encouragement of settlement of disputes constitute strong arguments for enforcing releases." *Witt v. Watkins*, 579 P.2d 1065, 1068 (Alaska 1978). Insofar as Zeilinger does not deny that she gave the release "with an under-

standing of the nature of the instrument," the burden was on her "to show by clear and convincing evidence that the release should be set aside." *Id.* at 1069–70. Her contention that this burden does not apply in the employer-employee context, citing *id.* at 1070 n. 16, misreads *Witt.* Footnote 16 merely suggested the possibility that a lighter burden *might* apply where an employee executed a *personal injury release* with her employer. *See id.* (citing *Ricketts v. Pennsylvania R.R. Co.*, 153 F.2d 757, 760 (2d Cir.1946) (Frank, J., concurring)). The special pressure inherent in negotiating a personal injury release with the party for whom one *continues* to work should be obvious.

6. This court reviews grants of summary judgment to determine whether there are any genuine issues of material fact and, if not, whether the moving party is entitled to judgment on the established facts. *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985). All inferences are drawn in favor of the nonmoving party, in this case Zeilinger. *Id.*

contrary, there are also the facts that she signed the severance check as accepted under protest and that she filed suit against SAPC within three months of her release. Furthermore, she notes that she explicitly questioned whether the RIF was real before she signed the separation agreement, without receiving a satisfactory response. Far from presenting evidence which reasonably tends to dispute SAPC's proffered facts, the essence of her evidence compels the conclusion that SAPC is entitled to judgment as a matter of law on the issue of whether Zeilinger relied on any misrepresentation concerning the real reason for her dismissal.

### B

■ Subsequent to the grant of summary judgment concerning the issue of misrepresentation, Zeilinger amended her complaint to add a claim for breach of the covenant of good faith and fair dealing as another defense to the separation agreement. The theory behind this claim is that SAPC's alleged misrepresentations concerning the true reason for releasing Zeilinger constitute a breach of the covenant of good faith and fair dealing implied in every employment contract in Alaska, *Mitford v. De Lasala,* 666 P.2d 1000, 1007 (Alaska 1983), and that "a breach of the covenant during her employment relationship should work to let her out of that release agreement." The superior court granted summary judgment in SAPC's favor on this issue.

Zeilinger, in her brief, makes no legal or logical argument as to how a breach of the *employment* agreement should act to set aside the *separation* agreement that released SAPC from liability for any breach of the employment agreement. She merely asserts that "[b]reach of the covenant in obtaining the release should allow the employee to avoid the separation agreement." As SAPC points out, this argument is circular: Zeilinger seeks to avoid her release of claims on the ground that she had a claim.

The argument suffers from an additional flaw in that it is founded upon SAPC's alleged misrepresentation as to the real reason for her dismissal. While the misrepresentation by itself might support a breach of contract action on the employment agreement, it has no demonstrable relation to the separation agreement, unless the misrepresentation somehow played a part in inducing Zeilinger to give up rights under the employment agreement. This, however, is merely a restatement of the misrepresentation theory that has already failed.

### C

■ Zeilinger's final ground for setting aside the separation agreement is that she signed it while under economic duress. The superior court directed a verdict on this issue, in SAPC's favor, at the conclusion of Zeilinger's case. When reviewing directed verdicts, this court determines whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment. *Bendix Corp. v. Adams,* 610 P.2d 24, 27 (Alaska 1980).

This court first addressed the claim of economic duress in *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.,* 584 P.2d 15 (Alaska 1978). While noting the difficulty in outlining a single formula for what constitutes economic duress, *id.* at 21 (quoting Dawson, *Economic Duress—An Essay in Perspective,* 45 Mich. L.Rev. 253, 289 (1947)), the court referred approvingly to the following approach: "[D]uress exists where: (1) one party involuntarily accepted the terms of another, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of coercive acts of the other party." *Id.; see also Helstrom v. North Slope Borough,* 797 P.2d 1192, 1197 (Alaska 1990) (applying this test).

In this case, Zeilinger claims she acted involuntarily, and SAPC concedes the point inasmuch as the test is subjective. *Helstrom,* 797 P.2d at 1197. As to the second requirement, Zeilinger points to apparently dire consequences should she find herself without an income, without insurance, and without the severance pay that was offered: "[S]he was in danger of losing her

home and assets, she believed she might be forced into bankruptcy, and she desperately needed the medical insurance." Appellant's Brief at 43. SAPC asserts that Zeilinger had a reasonable alternative, in that "she had ample time to seek a judicial remedy barring her termination." Appellee's Brief at 27.

In determining whether a reasonable alternative was available, we employ an objective test, and the outcome depends on the circumstances of each case. *Totem Marine*, 584 P.2d at 22; *Helstrom*, 797 P.2d at 1197. A legal remedy may constitute a reasonable alternative. *Totem Marine*, 584 P.2d at 22. It would not be adequate, however, if delay in obtaining it "would cause immediate and irreparable loss to one's economic or business interest." *Id.* SAPC refers to no evidence in the record that would compel a jury to conclude that legal action offered Zeilinger a reasonable alternative to signing the separation agreement, nor can we find any. SAPC may be able to present such evidence in its case-in-chief, but until such a showing is made, a directed verdict is inappropriate with regard to this requirement.

Zeilinger, however, has to demonstrate a factual issue concerning each of the three prongs. *See Wassink v. Hawkins*, 763 P.2d 971, 974 (Alaska 1988) (failure to show factual dispute on third prong fatal to appeal from summary dismissal of economic duress argument). The third prong embodies two requirements: (a) coercive acts on the part of the other party and (b) a causal link between the coercive acts and the circumstances of economic duress. The court in *Helstrom* noted with approval that the " 'coercive acts' prong has been liberally construed, requiring that the strained circumstances be the result of acts which are criminal, tortious, or even merely 'wrongful in the moral sense.' " *Helstrom*, 797 P.2d at 1198. Even thus construed, however, no "coercive act" is present in Zeilinger's case.

Zeilinger's theory seems to be that the wrongfulness of her discharge, if proved, would provide the necessary coercive act. We disagree. Assuming for the sake of argument that Zeilinger's discharge was not pursuant to a valid RIF, there is still no evidence that the discharge was intended to, or that it did in fact, "coerce" Zeilinger into signing the release. SAPC notified her she was being terminated; there were no conditions, and she was given no opportunity to avoid termination. SAPC then offered her the chance to compromise any claims she might have arising out of the termination in exchange for valuable consideration. In connection with the offered release, SAPC neither made any threats nor undertook any action which could be considered coercive. *See* Restatement (Second) of Contracts § 175 (1981) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim."); *see also Totem Marine*, 584 P.2d at 22 ("In many cases, a *threat* to breach a contract or to withhold payment of an admitted debt has constituted a wrongful act.") (emphasis added). Put another way, SAPC did not improperly induce Zeilinger to release her claims through threats or coercion.

What did induce Zeilinger to release her claims was her burdensome financial circumstances. These circumstances were of her own making, and thus cannot be blamed on SAPC. *See EEOC v. American Express Publishing Corp.*, 681 F.Supp. 216, 219 (S.D.N.Y.1988) (employer cannot be held responsible for pressure employee felt from being sole supporter of family of six and being one month behind on home and auto payments); *LaBeach v. Beatrice Foods Co.*, 461 F.Supp. 152, 158 (S.D.N.Y.1978) (employer cannot be held responsible that bank was pressuring employee to repay $100,000 personal loan). Quite simply, economic necessity—very often the primary motivation for compromise—is not enough, by itself, to void an otherwise valid release. *Horgan v. Industrial Design Corp.*, 657 P.2d 751, 753–54 (Utah 1982).

### III

Zeilinger also appeals the superior court's award of $80,470 to SAPC for its

attorney's fees. *See* Alaska R.Civ.P. 82(a)(1). This award represents approximately 40 percent of SAPC's claimed actual fees of $201,175. "We will reverse an award of attorney's fees ... if the court abused its discretion by compensating excessive attorney hours...." *O.K. Lumber v. Providence Washington Insurance Co.*, 759 P.2d 523, 528 (Alaska 1988).

On its face, the claimed actual fees of $200,000 appear clearly excessive. The facts in the case were not particularly complex or unique, nor even subject to much dispute. The case did not involve questions of technical expertise, the legal issues weren't especially novel or original, and the trial was relatively brief.

The question whether too much time was spent by SAPC's attorneys is for the superior court. *Integrated Resources Equity Corp. v. Fairbanks North Star Borough*, 799 P.2d 295, 304 (Alaska 1990). The superior court, however, gave no explanation of its award. In light of our doubts as to the reasonableness of SAPC's claimed fees, we elect not to approve the superior court's award of a substantial portion of those fees absent some indication that the court carefully scrutinized the submissions and awarded Rule 82 compensation only on a percentage of *reasonable* expenditures. Thus, we remand for a new determination of Rule 82 attorney's fees.

The superior court's grants of summary judgment and directed verdict against Zeilinger are AFFIRMED. Its award of attorney's fees to SAPC is REVERSED and this case REMANDED for further proceedings consistent with this opinion.

RABINOWITZ, Chief Justice, dissenting.

I dissent from the court's affirmance of the superior court's grant of a directed verdict against Zeilinger as to her claim that the separation agreement should be set aside because she signed it while under economic duress.[1]

The court correctly concludes that a directed verdict against Zeilinger would have been inappropriate as to the first two elements of economic duress: an involuntary acceptance of terms provided by another; and that the circumstances permitted no other alternative but to execute the release. My difference with the court's opinion centers on its conclusion that Zeilinger's proof failed to raise a jury issue as to the third element of economic duress. More particularly, that the circumstances were the result of coercive acts on the part of SAPC. *Helstrom v. North Slope Borough*, 797 P.2d 1192, 1197 (Alaska 1990).

This third element of economic duress consists of two prongs: coercive acts on the part of the other party (SAPC) and a causal link between the coercive acts and the circumstances of economic duress. As to this third element, the court notes that it is to be liberally construed but nevertheless holds that: "Even thus construed, however, no 'coercive act' is present in Zeilinger's case." In support of this conclusion the court reasons in part that Zeilinger's discharge was not intended to, nor did it in fact, coerce her into signing the release. "What did induce Zeilinger to release her claims were her burdensome financial circumstances."

In regard to this latter question Zeilinger argues in part that:

(1) Sandra's financial obligations were based in part on assurances by SAPC management that North Slope employees should not expect any reductions in force; in part upon temporary and unavoidable financial problems;

(2) the company added Zeilinger to a legitimate reduction in force in an attempt to terminate her without utilizing the progressive discipline steps to which she was entitled; there was never any intent to reduce the clerical force or eliminate Zeilinger's position;

(3) the supervisor who added Zeilinger to the RIF list was well aware of her financial difficulties; he added her to the RIF list to avoid the progressive discipline policy.[2]

---

**1.** I am in agreement with the court's disposition of the remaining issues in this appeal.

**2.** Review of the record indicates evidentiary support for these assertions.

**660**

I think a jury could reasonably conclude that SAPC's threatened deprivation of income did contribute to Zeilinger's economic distress. Although it is correct to say that Zeilinger incurred her financial obligations on her own, here a jury could reasonably find that it was not her financial obligations alone that caused her to execute the separation agreement. Rather, a jury could reasonably determine that the imminent deprivation of her income, which would arguably have an immediate and catastrophic effect on her financial situation, played a direct causal role in her decision to agree to and execute the separation agreement.[3]

---

**3.** Implicit is my further conclusion that the act which deprived Zeilinger of her income—more particularly her termination, was wrongful and that Zeilinger's evidence on the point is sufficient to withstand a motion for directed verdict.