OLSEN LOGGING COMPANY and
Cigna Companies, Appellants,

v.

David B. LAWSON, Silver Bay Logging
Co., and Alaska Timber Insurance
Exchange, Appellees.

No. S–4804.

Supreme Court of Alaska.

July 30, 1993.

See also 832 P.2d 174.

BethAnn Boudah Chapman, Mala J. Reg-
es, Faulkner, Banfield, Doogan & Holmes,
Juneau, for appellants.

Terri L. Herring–Puz, Welch & Condon,
Tacoma, WA, Patrick E. Murphy, Batche-
lor, Murphy & Brinkman, Juneau, for ap-
pellee David B. Lawson.

Paul M. Hoffman, Robertson, Monagle &
Eastaugh, P.C., Juneau, for appellees Sil-
ver Bay Logging and Alaska Timber Ins.
Exchange.

Before RABINOWITZ, C.J., and
BURKE, MATTHEWS, COMPTON and
MOORE, JJ.

## OPINION

MATTHEWS, Justice.

### INTRODUCTION

David Lawson suffered two serious on-the-job injuries, one in 1969 and one in 1984, while working for different employers. He is now apparently totally and permanently disabled. This case involves the allocation of responsibility for Lawson's disability between his two former employers.

### FACTS AND PROCEEDINGS

In November of 1969, while working as a rigging slinger for Olsen Logging Company, Lawson was hit in the head by a choker bell and suffered a severe skull fracture. Surgery was required to relieve an extensive subdural hematoma. Upon his release from the hospital six weeks after the accident, doctors observed that Lawson was "fully independent" with a "notably short attention span and impaired memory."

Lawson began receiving temporary total disability benefits and was placed in a vocational rehabilitation program in a community college. In January of 1971 Lawson's neurosurgeon, Dr. Tytus, determined that Lawson's neurological condition had stabilized and recommended that Lawson "be evaluated for permanent partial disability purposes." The following month, Dr. Berens examined Lawson and concluded that "his disability amounts to 15% of the maximum allowable for unspecified disability." Alaska Pacific Assurance Company (ALPAC), Olsen's insurer, terminated Lawson's temporary total disability payments in mid-February, and in March paid Lawson an advance of $1000.

In 1972 Lawson withdrew from his vocational rehabilitation program. He returned to work for Olsen as a "safety man" for a brief period, but was released because "[Olsen] was too small of an outfit for a safety man." Afterwards, Lawson logged for another company for two to three months, returning the following year for a period of three to six months.

In early 1973, Lawson, represented by counsel, considered a draft compromise and release suggested by ALPAC. Several medical evaluations were completed at this point. Dr. Tytus determined that Lawson was not totally disabled but had a 30% permanent partial disability. Dr. Rynearson, a psychiatrist, found no psychiatric abnormality while Lawson's psychologist, Dr. Lamphere, completed a psychological evaluation and described Lawson as "confused and perplexed."

Lawson signed the compromise and release on May 3, 1973. The Alaska Workers' Compensation Board (Board) approved the settlement a few days later. The agreement awarded Lawson $7,104.19 in exchange for a release of further disability compensation. The parties specifically agreed that Lawson "[was] not permanently and totally disabled as a result of the covered accident."

In February of 1974, Lawson went to Dr. Leo complaining of poor judgment and reactions. Lawson reported six accidents in six months. Dr. Leo observed that Lawson acted like "a 12–14 year old." Also in 1974 the Social Security Administration determined that Lawson was disabled due to "chronic organic brain syndrome following [his] severe head injury" and secondary psychiatric disorders. From 1975 through 1978 there was no evidence that Lawson worked.

Lawson returned to logging in 1979 when "[he] just got tired of not being out there." From 1979 until September 1984 he worked in a series of jobs with seasonal periods of unemployment.

Because the two calendar years immediately prior to the claimed injury are the base years for computing the gross earnings of an injured employee, AS 23.30.-220(a)(1), we note Lawson's earnings for 1982 and 1983 in some detail. Lawson was unemployed from January through May and in October of 1982. He worked as a logger for four different employers during the six months of 1982 in which he did not collect unemployment. He earned $11,-135.97. In 1983 Lawson earned wages of $14,458.21 while logging for two employ-

ers.[1] Lawson collected unemployment compensation for three weeks during 1983.

In 1984 Lawson was unemployed from January 1 through May 14. In his employment that followed until his injury on September 15, 1984, he earned some $11,093.

Between 1979 and 1984 Lawson suffered a number of injuries while logging. In April of 1980 he suffered a compression fracture of a vertebrae and fractured ribs when he was struck by a falling sapling. On July 23, 1981, he sustained a contusion of the left ankle. In 1983, he suffered a low back injury in May, on July 20th a chain saw kicked back and cut his leg, and on August 23rd he fell and suffered a back injury. On July 7, 1984, he suffered a shoulder injury when a snag fell, hitting him, and two weeks later he was cut on the left wrist by a chain saw.[2]

On September 15, 1984, while working for Silver Bay Logging, Lawson injured his back when he fell approximately eleven feet onto a root wad. When Lawson was unable to return to work because of back pain, he filed an application for adjustment of claim with the Board, seeking permanent and total disability compensation from Silver Bay. Silver Bay joined Olsen as a party. Lawson amended his petition to assert a claim against Olsen and ALPAC to set aside the 1973 compromise and release.

After a hearing the Board set aside the compromise and release and ordered Olsen to pay Lawson permanent total disability "with credit for disability compensation paid." In addition, Olsen was ordered to reimburse Silver Bay's insurer for compensation payments made by Silver Bay. Olsen appealed to the superior court which upheld the Board's decision. This appeal followed.

Two major questions are presented:

(1) Did the Board err in setting aside the compromise and release?

(2) Did the Board err by failing to apply the last injurious exposure rule to Lawson's 1984 injury?

We answer each of these questions in the affirmative.

DISCUSSION

A. *Set-Aside of the 1973 Compromise and Release*

1. Grounds relied on by the Board in setting aside the 1973 compromise and release.

The Board concluded that the test for setting aside releases in common law personal injury cases expressed by this court in *Witt v. Watkins*, 579 P.2d 1065 (Alaska 1978), should be applied in workers' compensation cases. Under *Witt* a release may be set aside if the releasor at the time of signing the release did not intend to discharge the disability which was subsequently discovered. The Board quoted the following excerpt from *Witt:*

> The test should be whether, at the time of signing the release, the releasor intended to discharge the disability which was subsequently discovered. Relevant to the determination of this question are all of the facts and circumstances surrounding execution of the release. Also relevant to the determination is whether a reasonable person in the position of the releasor under the circumstances then existing would have had such an intent.
>
> . . . .
>
> Niceties of distinction between the extent of a known injury or a difference in the character of the injury should not be determinative. In either event, *the decision as to whether the release is enforceable should hinge on whether the releasor, at the time of signing the release, intended to discharge the disability which was subsequently discovered.*
>
> . . . .

---

1. In addition he logged as a contract cutter and earned some $6,000 in profits. The Board, however, did not include this in its calculations as to some extent the profit was chargeable to the services of Lawson's wife and a friend.

2. Despite his accident proneness, apparently Lawson was found to be a satisfactory employee by at least one of his employers, as Reid Timber rehired him in three different years.

Once the party relying on a release establishes that it was given with an understanding of the nature of the instrument, the burden is on the releasor to show by clear and convincing evidence that the release should be set aside. Factors that may be considered are the manner in which the release was obtained—including whether it was hastily secured at the instigation of the releasee; whether the releasor was at a disadvantage because of the nature of his injuries; whether the releasor was represented by counsel; whether he relied on representations of the releasee or a physician retained by the releasee and whether liability was seriously in dispute. The relative bargaining positions of the parties and the amount to be paid should also be considered.

*Id.* at 1068–70 (emphasis added) (footnotes omitted).

The Board found that Lawson understood the nature of the instrument which he signed. It also found, however, that he lacked judgment and foresight because of his brain injury, and was in a relatively weak bargaining position because of his financial distress and his inability to provide for his family. Finally, the Board found that Lawson was unable to discern any alternative other than agreeing to the settlement as temporary total disability had been discontinued in 1971 and, although he was represented by an attorney, the attorney was a Washington attorney who may not have been familiar with Alaska workers' compensation law. The Board also noted that the amount of the settlement, $7,100, "was insignificant in relation to [Lawson's] disability and his earnings at the time of injury." Noting these facts, the Board concluded:

[W]e find that Employee did not intend to discharge the disability which was subsequently discovered. In the C & R the parties agreed Employee was not permanently totally disabled. Employee was working as a logger, with apparent success, at the time the C & R was signed. It was not until January 1989 that comprehensive neuropsychological testing revealed that Employee suffers from learning and memory deficits and from right hand psychomotor slowing, rendering Employee unable to work safely as a logger. Employee's "disability" for the purposes of the Alaska Workers' Compensation Act, is his learning deficit. Employee could not have intended to release that disability, because that disability was not recognized.

The Board also concluded as an alternative ground for setting aside the compromise and release that the parties had made a mutual mistake of fact in that both Lawson and ALPAC believed that Lawson was not permanently totally disabled at the time of the compromise and release.

2. Does the Board have authority to set aside a compromise and release on the basis of mistake?

■ Alaska Statute 23.30.012 governs the compromise and release of workers' compensation claims. That statute provides that settlement agreements are not valid until they are approved by the Board. Upon approval by the Board, settlement agreements have the same legal effect as awards, except that they are more difficult to set aside:

If approved by the board, the agreement is enforceable the same as an order or award of the board and discharges the liability of the employer for the compensation notwithstanding the provisions of AS 23.30.130 [modification of awards], 23.30.160 [assignment and exemption of claims], and 23.30.245 [invalid agreements].

AS 23.30.012.

■ The Board has the authority to modify awards on its own initiative or upon application of any party for a change in conditions or because of "a mistake in its determination of a fact." This power, however, is subject to a time limit of "one year after the date of the last payment of compensation benefits...." AS 23.30.130(a). The power to modify *awards* for changed conditions or mistakes of fact expressed under subsection .130 does not, however, extend to *settlements*. Subsection .012

provides that approved settlement agreements discharge the liability of the employer for compensation *notwithstanding subsection .130.* This is, therefore, an expression of legislative intent that approved agreements may not be modified because of mistakes of fact.[3] On this ground we conclude that the Board erred in setting aside the compromise and release on unilateral and mutual mistake grounds.[4]

B. *Application of the Last Injurious Exposure Rule to Lawson's 1984 Injury*

■ In *Ketchikan Gateway Borough v. Saling,* 604 P.2d 590 (Alaska 1979), we adopted the last injurious exposure rule, which holds that when an employee suffers successive injuries while working for different employers, both of which contribute to the employee's disability, full liability is imposed on the later employer. *Id.* at 595.

Two determinations must be made under the last injurious exposure rule in order to impose liability on the second employer:

(1) whether employment with the subsequent employer "aggravated, accelerated, or combined with" a pre-existing condition; and, if so, (2) whether the aggravation, acceleration, or combination was a "legal cause" of the disability, i.e., "a substantial factor in bringing about the harm."

*United Asphalt Paving v. Smith,* 660 P.2d 445, 447 (Alaska 1983) (quoting *Saling,* 604 P.2d at 597, 598).

The Board found that the last injurious exposure rule was not applicable in this case because Lawson was permanently totally disabled "at all times after his 1969 head injury." Therefore the Board concluded that his 1984 back injury while working for Silver Bay "could not be a substantial factor in his disability."

In *Estate of Ensley v. Anglo Alaska Construction, Inc.,* 773 P.2d 955 (Alaska 1989), we were presented with a case in which the worker was unable to continue to work for two independent reasons. The worker had suffered a work-related injury and was also unable to continue working because of treatment necessitated by cancer. The Board held that compensation should be terminated as of the time the worker began cancer treatment, reasoning that because the illness prevented the worker from further work, the work-related injury could not be the cause of the worker's continuing disability. *Id.* at 957. We rejected this rationale and held that where there are concurrent causes of disability, the fact that one cause would be independently sufficient to cause the disability does not mean that the work-related injury is not also a cause of the continuing disability. We stated:

> The medical records indicate that Ensley suffered from two independent conditions—one work-related and one not—either of which would have prevented him from working. We believe the Board erred in ignoring Ensley's ... loss of earning capacity due to the work-related back injury. The fact that Ensley also suffered a concurrent ... loss of earning capacity due to the cancer does not destroy the causal link between the work injury and his ... loss of earning capacity.

*Id.* at 958.

In *Estate of Ensley* we relied on a Washington case, *Shea v. Department of Labor and Industries,* 12 Wash.App. 410, 529 P.2d 1131 (1974). Shea suffered from a non-work-related condition which rendered him totally and permanently disabled. He also suffered from an on-the-job work injury which arguably was also sufficient to disable him. The Department of Labor

---

**3.** We note that even if we were to assume the application of AS 23.30.130 to this case, modification would be barred because it would take place some sixteen years after the one-year limit.

**4.** Under Civil Rule 60(b) mistake is a basis for setting aside a final civil judgment. This is subject to a one-year limitation. However, Civil Rule 60(b) also adverts to the possibility of "an independent action to relieve a party from a judgment...." Not presented in this appeal is the question whether an independent action might be maintained to relieve a party of a Board approved settlement.

took the position that the earlier non-work-related disability prevented Shea from collecting benefits for the work-related disability. *Id.* 529 P.2d at 1133. The Washington Court of Appeals reversed for reasons which we expressed in *Estate of Ensley* as follows:

> In rejecting the department's position that the nonwork-related disability prevented an award of disability compensation, the court relied upon the notion that the compensation act was designed to provide benefits "not only to workmen with no prior physical or mental impediments, but also to workmen who may be afflicted with preexisting physical or mental infirmities or disabilities." Secondly, the court stated that "the remedial and beneficial purposes of the act should be liberally construed in favor of workmen and beneficiaries."

*Estate of Ensley,* 773 P.2d at 959 (quoting *Shea,* 529 P.2d at 1133). We agreed with the reasoning of the *Shea* court and concluded that "the remedial policy of the Act is furthered by providing compensation for . . . disabilities even when a concurrent unrelated medical condition has also rendered the worker unable to earn his or her normal wages." *Id.*

■ This case is factually similar to *Ketchikan Gateway Borough v. Saling,* 604 P.2d 590 (Alaska 1979). Saling was injured on the job in 1968 in an explosion which his employer regarded as totally disabling. His employer voluntarily paid him continuing compensation payments for permanent total disability. In 1973 Saling went to work for a second employer, but continued to receive total disability payments. In the summer of 1975 his former employer learned that Saling was working and stopped paying total disability payments. Six weeks later Saling suffered another serious on-the-job injury. After the second accident, he did not return to work. *Id.* at 592. Saling filed compensation claims against both his employers, neither of whom contested his contention that he was permanently totally disabled. The Board found that his first employer was completely responsible for Saling's disability because Saling was permanently and totally disabled while he was working for his second employer. *Id.* at 593. The Board relied on evidence from two physicians who testified that Saling should not have been working at his second job because it was too demanding for him in view of his previous injuries. *Id.*

We rejected the Board's reasoning that because Saling was already totally disabled, his second injury could not be compensable:

> The board's reasoning misinterprets the concept of disability in Alaska worker's compensation law. The Workmen's Compensation Act defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." AS 23.30.265(10). The primary consideration is not the degree of the worker's physical impairment, but rather the loss of earning capacity related to that impairment. In determining the extent of Saling's preexisting disability, his demonstrated earning capacity cannot be ignored. A review of the record reveals no evidence that Saling failed to perform his job duties satisfactorily. When Saling's earning capacity at the time he began work for the [second employer] is compared with his present earning capacity, it is obvious that a change has taken place. We conclude, therefore, that the board's finding of preexisting total disability is not supported by substantial evidence.

*Id.* at 594 (citations omitted).

*Saling* is arguably distinguishable from the present case because Saling was steadily employed after his first injury whereas Lawson's subsequent employment was more sporadic. Nonetheless, Lawson does not fit the mold of the "odd lot" worker who is totally disabled despite his ability to obtain occasional part-time employment. We have described such a worker as a worker who, while not abjectly helpless, is unable because of injuries

> to perform services other than those which are so limited in quality, dependa-

bility or quantity that a reasonably stable market for them does not exist. The evidence here discloses that [the worker] is a carpenter but is unable physically to follow that trade. He is not qualified by education or experience to do other than odd jobs provided they are not physically taxing. As the Supreme Court of Nebraska has pointed out, the "odd job" man is a nondescript in the labor market, with whom industry has little patience and rarely hires. Work, if appellee could find any that he could do, would most likely be casual and intermittent.

*J.B. Warrack Co. v. Roan,* 418 P.2d 986, 988 (Alaska 1966) (footnotes omitted).[5]

As an indication that Lawson was more than an "odd lot" worker, we note that his average weekly wage computed for 1982 and 1983 is roughly $256, whereas the Board awarded him compensation based on an average weekly wage in 1969 of $165.38. We conclude, therefore, that in this case, as in *Saling,* the fact that the employee was subsequently able to engage in remunerative work must speak louder than the medical evidence that the worker should not have been working in view of his prior injury.

The teaching of *Estate of Ensley, Saling,* and our other last injurious exposure rule cases, considered together, is that the Board should focus on the employee's most recent employment-related injury in considering his claim for disability compensation. The most recent injury must itself have caused, or must have aggravated, accelerated, or combined with a prior condition in such a way that it may be said to be a substantial factor in bringing about the employee's current inability to work. However, the Board should not find that a causal relationship does not exist merely because a prior injury might also suffice as a concurrent cause of the employee's current disability.

CONCLUSION

 The evidence supports Olsen's position that although Lawson had a residual brain injury, he had a sound body and was able to work as a logger. After his 1984 injury, Lawson's body may no longer be sound and he may no longer be able to work as a logger. The remedial and beneficial purposes of the Workers' Compensation Act would not be served by concluding that Lawson's 1984 injury is uncompensable merely because he suffered from a brain injury which was sufficient to cause his disability. The Board erred when it concluded that Lawson's 1984 injury necessarily was not a substantial cause of his disability because he was already totally disabled by reason of the 1969 accident.

For the above reasons, the superior court's decision affirming the Board's decision setting aside the compromise and release is REVERSED. On REMAND, the superior court should order the Board to reinstate the compromise and release. The superior court's decision affirming the Board's conclusion that Lawson was ineligible for compensation from Silver Bay because he was already permanently and totally disabled is REVERSED. On REMAND the superior court should remand this case to the Board with instructions to determine whether Lawson's 1984 injury caused or aggravated, accelerated, or combined with his prior condition to produce his current disability.

---

**5.** We have also noted Justice Cardozo's classic description of the "odd lot" man:

He [the plaintiff] was an unskilled or common laborer. He coupled his request for employment with notice that the labor must be light. The applicant imposing such conditions is quickly put aside for more versatile competitors. Business has little patience with the suitor for ease and favor. He is the "odd

lot" man, the "nondescript in the labor market." Work, if he gets it, is likely to be casual and intermittent.... Rebuff, if suffered, might reasonably be ascribed to the narrow opportunities that await the sick and halt.

*Hewing v. Peter Kiewit & Sons,* 586 P.2d 182, 187 (Alaska 1978) (quoting *Jordan v. Decorative Co.,* 230 N.Y. 522, 130 N.E. 634, 635–36 (1921) (footnotes omitted) (citations omitted)).