**Harry BLANAS, Appellant,**

v.

**The BROWER COMPANY, Transamerica Premier Insurance Co., Appellees.**

No. S–7352.

Supreme Court of Alaska.

June 13, 1997.

Harry Blanas, Anchorage, pro se.

Tracey L. Knutson, DeLisio, Moran, Geraghty & Zobel, Anchorage, for Appellees The Brower Company, and Transamerica Premier Insurance Co.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Harry Blanas entered into a compromise and release (C & R) with his employer and its insurer to resolve his workers' compensation claim. Sixteen months later he asked the Alaska Workers' Compensation Board to reopen his claim and modify the C & R, in part because he claimed representatives of the employer's insurer had fraudulently induced him to settle and sign the C & R. The Board denied his request, and the superior court affirmed. Blanas now appeals to this court. We reverse.

## II. FACTS AND PROCEEDINGS

While employed by the Brower Company in 1990, Blanas fell from a ladder and was injured. After the initial examinations and treatment, Blanas was referred to Dr. Michael Newman and continued under his care until April 1991. In March 1991 Dr. Newman declared Blanas medically stable and opined that Blanas did not have a permanent partial impairment.[1] Dr. Newman stated that he doubted that Blanas would be able to return to his previous occupation, "put him on a restriction with maximum lifting of 50 pounds and no repetitive lifting over 25 pounds," and noted that he "may require continued physical therapy and other treatments for symptom management."

As part of his workers' compensation claim, Blanas requested an evaluation of his eligibility for reemployment benefits. The reemployment benefits administrator assigned a rehabilitation specialist to perform an evaluation.[2] Based on the specialist's recommendation, the administrator found Blanas eligible.

The rehabilitation specialist developed several rehabilitation plans for Blanas. Blanas initially expressed interest in pursuing training and employment in drafting or hazardous material handling, the latter specifically in tank tightness testing. In mid-January 1992

---

1. Dr. Morris Horning also rated Blanas at a zero percent permanent partial impairment.

2. AS 23.30.041(c) states:
   If an employee suffers a compensable injury that may permanently preclude an employee's return to the employee's occupation at the time of injury, the employee or employer may request an eligibility evaluation for reemployment benefits. The employee shall request an eligibility evaluation within 90 days after the employee gives the employer notice of injury unless the administrator determines the employee has an unusual and extenuating circumstance that prevents the employee from making a timely request. The administrator shall, on a rotating and geographic basis, select a rehabilitation specialist from the list maintained under (b)(6) of this section to perform the eligibility evaluation.

the rehabilitation specialist learned that the physical requirements of tank tightness testing were beyond Blanas's post-injury capacities. Soon thereafter, the rehabilitation specialist noted that Blanas expressed interest in the occupation of construction estimator; the rehabilitation specialist explored this rehabilitation goal. In February and March 1992 the rehabilitation specialist worked on a new reemployment plan for Blanas in the estimator field. Before the estimator plan was completed, however, Blanas and Brower signed the C & R. Blanas contends that before he signed the C & R he had no knowledge of this new reemployment plan or the inappropriateness of tank tightness testing as a rehabilitation goal for him. The C & R specified that $2,500 would be paid to Blanas to defray the expenses of attending a one-week stateside course in tank tightness testing. Other provisions in the C & R implied that Blanas was free to choose an occupation for retraining, and mentioned several occupations the specialist had explored with Blanas, including hazardous material handling.

The parties signed the C & R on February 13, but the Board initially rejected it for reasons not relevant here.[3] On March 11 the parties signed an addendum containing changes that satisfied the Board. The addendum required that $2,500 be paid for expenses on a cost incurred basis for Blanas's "rehabilitation program as outlined." The Board approved the C & R and addendum on March 12. The agreement resolved all disputes between the parties and released Brower and its insurer from all claims for further benefits in exchange for $32,500.[4]

Blanas asserts that after he entered into the C & R he learned that the physical demands on a tank tightness tester exceeded his post-injury physical capacity. Blanas contends that he then unsuccessfully searched for employment for over a year. He enrolled in a real estate class, prepaid the fees, notified the insurer of his change in rehabilitation plans, and requested that his expenses be covered out of the settlement rehabilitation fund. The insurer then proposed a second addendum to the C & R; this proposal stated that Blanas "has determined, after the [C & R] was approved, that lifting restriction has prevented him from performing" hazardous material handling (tank tightness testing). It also stated that hazardous material handling was the goal of Blanas's rehabilitation program when the Board approved the C & R. It also stated that real estate was a different vocational goal than the one identified in the release or explored with the rehabilitation specialist. It stated that a maximum of $2,500 would be paid for rehabilitation training, and that the C & R was not otherwise altered. Blanas withdrew from the real estate class when computer examinations were added to the curriculum. Blanas refused to sign the second addendum.

In July and August 1993 Blanas petitioned the Board to reopen his claim and to modify the March 12, 1992, C & R, alleging misrepresentation, deceit, and fraud by the representatives of Brower's insurer.[5] In an affida-

---

3. Pursuant to AS 23.30.012, a settlement agreement is void if not approved by the Board.

4. In pertinent part, the release stated:

   In order to resolve this claim it is agreed that Mr. Blanas will be paid a total of $32,500.00. Of that amount, $20,000.00 represents 18 months of .041(k) benefits which is being paid to support Mr. Blanas through his retraining process. In addition, $2,500.00 is being paid to Mr. Blanas to defray the cost of transportation and schooling for a one week course in either Chicago or New Jersey on tightness testing as part of the plan for hazardous material handling. This amount would also defer the expenses of room and board and other related expenses while attending the week long school.

   The remainder of the $32,500.00 is allocated as a compromise of Mr. Blanas' claim that he is entitled to further temporary total disability benefits and permanent partial impairment benefits. In exchange, Mr. Blanas waives any claims he may have against Transamerica, Wilton Adjustment, GAB and/or their representatives for interference with his medical treatment or selection of physician or any claims that he may make for bad faith. In addition, he waives any rights that he may have under the Workers' Compensation Act with the exception of medical benefits which are payable pursuant to the Workers' Compensation Act in the future.

5. Blanas has appeared *pro se* before the Board, superior court, and this court. Blanas and Brower dispute whether Blanas had an attorney review the C & R prior to its signing.

vit filed with the Board in October 1993, he affied that he entered into the C & R on the representations of the insurer's representatives for "the specific purpose" of receiving rehabilitation training in the field of tank tightness tester, to be eligible for "available employment as represented." He affied that at the time he signed the C & R, he had "no knowledge that the plan to retrain me as a tank tightness tester had been abandoned as non-viable reemployment by the rehabilitation experts." He also affied that the nonviability of that field had been communicated to the insurer's representatives. He further asserted that he understood, when he signed the C & R, that there was "genuine reemployment" available in that field. Blanas sought, *inter alia,* payment for loss of reasonable earnings from the date of the release forward, damages for the loss of a reasonable rehabilitation program, and emotional and punitive damages. Blanas also argued, in objecting to the Board chair's assessment of the issues, that his affidavit established that the insurer's representatives knew the rehabilitation field specified in the C & R offered Blanas no reemployability, but that they elected not to disclose that fact to Blanas.

The Board denied Blanas's petition in mid-March 1994. It held that it lacked jurisdiction to set aside the C & R due to unilateral or mutual mistake of fact, citing *Olsen Logging Co. v. Lawson,* 856 P.2d 1155, 1159 (Alaska 1993). It also held that, while it had the authority to permit an independent action to set aside the C & R, Blanas's fraud allegations were "probably unfounded" and that even if they were not, they did not rise "to the level of fraud required for an independent action" as defined by Alaska case law.

Blanas asked the Board to reconsider. In a sworn statement filed with the Board in late March, Blanas asserted that the insurer's representatives knew the tank tightness testing goal had been abandoned January 15, 1992, and that, although its representatives already knew that the goal was unsuitable for Blanas, on January 19 the insurer made the settlement offer based on the tank tightness testing goal. He characterized the result as the "theft of Blanas' rights by decep-

tion." He filed new pleadings attempting to reopen the modification issue. He asserted that the C & R was based on two considerations: (1) the cash settlement for the injury, and (2) the tank tightness tester rehabilitation training. He argued that Brower had admitted Blanas had not received the "specific rehabilitation."

At a preconference hearing, the parties agreed that all issues presented in Blanas's original petitions and subsequent pleadings would be addressed in a final proceeding before the Board. Blanas argued that he had been deprived of his right to call witnesses and right to due process of law. He had listed witnesses who theoretically would have been knowledgeable about facts, allegedly supporting his assertion that the insurer's representatives had induced him to sign the C & R knowing he could not meet the specified reemployment goal. The Board denied Blanas's request for reconsideration.

Blanas appealed to the superior court. (He filed his appeal before the Board denied his motion for reconsideration, but obtained a superior court order staying the appeal pending the Board's resolution of that motion.)

The superior court affirmed the Board's denial of Blanas's petition to set aside the C & R. Blanas then filed this appeal.

## III. DISCUSSION

### A. Standard of Review

■ We give no deference to the decision of a superior court acting as an intermediate court of appeal, and independently review the merits of an administrative decision. *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992). We there summarized the different standards for reviewing administrative decisions:

We have recognized four principal standards of review of administrative decisions. The "substantial evidence" test is used for questions of fact. The "reasonable basis" test is used for questions of law involving agency expertise. The "substitution of judgment" test is used for questions of law where no expertise is involved. The "reasonable and not arbitrary" test is used for review of administrative regulations.

*Id.* (citing *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975)).

■ Whether the Board had jurisdiction or authority to set aside the C & R is a legal question involving the interpretation of AS 23.30.012. We review questions of statutory interpretation under the substitution of judgment standard. *Raris v. Greek Corner*, 911 P.2d 510, 511 n. 3 (Alaska 1996).

B. *Denial of Blanas's Petition to Reopen or Modify the C & R without a Fact Hearing*

■ Blanas argues that the superior court erred in affirming the Board because he was denied a fair hearing before the Board. Blanas asserts that the C & R should be set aside because Brower's insurer secured the release through duress, coercion, fraud, and misrepresentation. He claims that the insurer knew that the rehabilitation goal identified in the C & R, tank tightness testing, was physically unsuitable for him; he asserts that he would not have signed the C & R, with its financial limitation on rehabilitation training, if he had known this was not a realistic reemployment goal.[6]

Brower and its insurer correctly assert that the primary issue before us is whether the Board had authority to set aside the C & R. They first argue that the Board had no authority to set aside a C & R for a mistake of fact.

1. *Mistake of fact as basis for relief*

■ Alaska Statute 23.30.012 governs C & R agreements for workers' compensation claims. In *Olsen Logging*, we interpreted that statute and held that the Board has no authority to set aside a C & R for a mistake of fact. 856 P.2d at 1158. We there stated:

Alaska Statute 23.30.012 governs the compromise and release of workers' compensation claims. That statute provides that settlement agreements are not valid until they are approved by the Board. Upon approval by the Board, settlement agreements have the same legal effect as awards, except that they are more difficult to set aside:

If approved by the board, the agreement is enforceable the same as an order or award of the board and discharges the liability of the employer for the compensation notwithstanding the provisions of AS 23.30.130 [modification of awards], 23.30.160 [assignment and exemption of claims], and 23.30.245 [invalid agreements].

AS 23.30.012

The Board has the authority to modify awards on its own initiative or upon application of any party for a change in conditions or because of "a mistake in its determination of a fact." This power, however, is subject to a time limit of "one year after the date of the last payment of compensation benefits...." AS 23.30.130(a). The power to modify *awards* for changed conditions or mistakes of fact expressed under subsection .130 does not, however, extend to *settlements*. Subsection .012 provides that approved settlement agreements discharge the liability of the employer for compensation *notwithstanding subsection .130*. This is, therefore, an expression of legislative intent that approved agreements may not be modified because of mistakes of fact.

*Id.* at 1158–59 (emphasis in original) (footnotes omitted). Relying on this passage from *Olsen Logging*, the Board held that it did not have the jurisdiction to set aside the C & R based on Blanas's allegations that the release was signed by mistake. It did not err in so holding.

2. *Fraud as basis for relief*

■ This appeal is not resolved by our conclusion that the Board could not set aside the C & R for an alleged mistake of fact.

---

6. Blanas also asserts that he signed the C & R under duress because the insurer had coerced and improperly influenced his doctors to issue premature medical stability diagnoses, to issue zero percent impairment ratings, and to limit examinations and treatment. Because his appellate briefs contain no legal discussion of those assertions as a basis for relief, we do not reach them. *Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

Blanas expressly asserted that the insurer had obtained his signature on the C & R by fraudulently concealing or misrepresenting Blanas's reemployability in the occupation specified. He claimed that rehabilitation training in that occupation was one of the two bases for his willingness to settle, and argued that the $2,500 rehabilitation training allowance would have covered tank tightness testing training, but would have been insufficient to cover other training that would make him reemployable.

The Board acknowledged that Blanas was alleging fraud and misrepresentation. The Board stated that footnote 4 of *Olsen Logging* recognized the possibility of "an independent action to relieve a party from a judgment under Civil Rule 60(b)." Based on this footnote and Professor Larson's treatment of this issue in his treatise,[7] the Board concluded that it had the authority to permit an independent action to set aside the C & R based on fraud. The Board held that the C & R could not be set aside, however, because the conduct alleged by Blanas, if it occurred, did not rise to the level of fraudulent behavior required for an independent action to set aside a judgment.

We first consider whether the Board even had the power to set aside a fraudulently obtained C & R. In *Greater Anchorage Area Borough v. City of Anchorage*, 504 P.2d 1027, 1033–34 (Alaska 1972), this court held that the Alaska Public Utilities Commission exceeded its statutory authority when it adjudicated a dispute not within the Alaska Public Utilities Commission Act. In so holding, it approvingly quoted a Washington Supreme Court opinion containing the following passage:

> It is well settled ... that a public service commission is an administrative agency created by statute and as such has no inherent powers, but only such as have been expressly granted to it by the legislature or have, by implication, been conferred upon it as necessarily incident to the exercise of those powers expressly granted.

*Id.* at 1033 n. 19. Even though the legislature did not expressly give the Alaska Workers' Compensation Board authority to set aside a C & R for fraud, we conclude that the power to do so has "by implication, been

7. The Board quoted at length from Professor Larson's treatise, which describes the basic rule for reopening a case for fraud and defines the fraudulent behavior that would justify a reopening. The following is a portion of the treatise passage quoted by the Board:

> Apart from reopening for change in condition where available under the foregoing analysis, and apart from express statute, awards and settlements cannot be disturbed except upon a showing that they were procured by fraud. This remedy may be based on either specific provisions of the compensation act or upon the general power of courts to set aside judgments obtained by fraud.
> . . . .
> Fraud may be in the form of intentional deception, as when the employer dishonestly induced the signing of an agreement by telling the employee that this was necessary if the employee was to have his medical expenses paid, or by falsely telling the employee that he would be able to hold his old job, and as when the employee in obtaining a settlement misrepresented the circumstances of an accident, saying that it was the result of inadvertently tripping over an air hose when in fact it was the result of horseplay. But the "fraud" may also be constructive, and may even consist, for example, in the honest but entirely erroneous

opinion, expressed by the insurance representative and insurance doctor in the agreement negotiations, that claimant's condition would clear up in sixty days, when that opinion induced claimant to acquiesce in the agreement. As to doctors, courts have found constructive fraud sufficient to justify reopening when even an innocent misrepresentation has been made by a physician chosen by the employer or its insurer, and those representations, have been relied on by the claimant. If, however, claimant has relied on the representations of her own physician, there has been no fraud.
Ignorance or misunderstanding on the claimant's part will not in itself justify reopening a settlement or award, if the employer had nothing to do with inducing claimant's misapprehension. So, when claimant alleges that he belatedly discovered that he might have a claim under a different statute, or when he says that he was incapable of understanding the legal implication of the agreement he signed, reopening will not be granted in the absence of fraud or insanity. And even as to insanity, North Carolina has ruled that an assertion that claimant was mentally incompetent at the hearing due to his brain injury was not of itself sufficient ground to set aside the judgment denying compensation.
3 Arthur Larson, *The Law of Workmen's Compensation* § 81.51(a), (b), 15–1120 to 1134 (1992).

conferred upon it as necessarily incident to the exercise" of the adjudicatory power expressly granted. *Id.*

Courts in other jurisdictions considering this issue have held that the board has the inherent or implied power to set aside settlement agreements that it has approved when the agreement is procured by either the employee's or the employer's fraud. *See Beese v. First Nat'l Stores,* 52 N.J. 196, 244 A.2d 689, 691 (1968) (noting that the Worker's Compensation Bureau possesses the inherent power, apart from a recently enacted statute providing the Board with express power to reopen awards "for good cause shown" within one year of its judgment, to reopen judgments for fraud, mistake, inadvertence or other equitable grounds); *Estelle v. Board of Educ.,* 14 N.J. 256, 102 A.2d 44 (1954) (holding that the Workmen's Compensation Division has "that power inherent in all tribunals to reopen judgments in instances of fraud"); *Hyman v. Essex County Carpet Cleaning Co.,* 157 N.J.Super. 510, 385 A.2d 257 (A.D. 1978) (holding "[i]rrespective of the absence of express statutory authority and a one year limitation imposed upon such a reopening in certain circumstances ... it is abundantly clear that the Division has the inherent power, 'comparable to that possessed by the courts ..., to reopen judgments for fraud, mistake, inadvertence or other equitable ground.'" (citation omitted) (emphasis omitted)).

In addition, the Florida Court of Appeal, relying upon a provision of Florida's workers' compensation statute stating that a Judge of Industrial Claims (JIC) has the "authority to do all things conformable to the law which may be necessary to discharge the duties of the office," found that the JIC had the authority to set aside a settlement agreement it had approved when it was discovered that the claimant had procured the settlement through misrepresentations and fraud. *Morgan Yacht Corp. v. Edwards,* 386 So.2d 883, 884 (Fla.App.1980). The court further stated that "[i]t would be inconceivable to give a Judge of Industrial Claims authority to approve a settlement but no authority to rescind his action when it is based on misrepresentations and fraud." *Id.*

Brower and its insurer do not argue that the Board erred in concluding that it had this power; their argument instead seeks to demonstrate that the Board correctly concluded that Blanas did not establish the existence of fraud sufficient to justify relief.

We conclude that the Board did not err in holding that it has authority to set aside a C & R obtained fraudulently. Alaska Statute 23.30.012 does not limit this inherent power; that statute simply prevents the Board from reopening a settlement on grounds for relief covered by AS 23.30.130, AS 23.30.160, and AS 23.30.245. Those sections do not discuss fraud, and they and AS 23.30.012 have no application here.

■ In *Olsen Logging* we commented on the possibility that an independent action might be maintained to relieve a party of a Board-approved settlement, and cited Civil Rule 60(b), which adverts to the possibility of an independent action. 856 P.2d at 1159 n. 4. That dictum did not state or imply that Rule 60(b) necessarily governs a petition of the sort filed by Blanas. Nor did it suggest that relief in such a case can be obtained exclusively by filing an independent action. We now conclude that one permissible way to seek relief from a Board-approved C & R on the ground it was fraudulently induced is to do what Blanas did: petition the Board to set aside or modify the C & R in the same workers' compensation case the C & R was intended to resolve.

Civil Rule 60(b) recognizes two categories of fraud that justify judicial relief from a judgment. For most fraud, such as that perpetrated by one party against another, a party can obtain relief from a judgment by moving under Rule 60(b)(3). Rule 60(b) also recognizes the inherent power of courts to set aside judgments for fraud upon the court. Alaska R. Civ. P. 60(b) ("This rule does not limit the power of a court ... to set aside a judgment for fraud upon the court.").

In a judicial proceeding, one important practical difference between "regular" fraud and fraud upon the court is the amount of time a party has in which to seek relief. A party asserting "regular" fraud must move for relief within a reasonable time after the

judgment, not to exceed one year. *See Allen v. Bussell,* 558 P.2d 496, 499 (Alaska 1976); Alaska R. Civ. P. 60(b)(3). In comparison, "the one-year time limitation does not apply to proceedings to correct orders obtained by fraud upon the court." *Mallonee v. Grow,* 502 P.2d 432, 437 (Alaska 1972). Thus, whether a party asserts "regular" fraud or a fraud upon the court potentially has an important bearing on the timeliness of the Rule 60(b) motion.

■ In its original decision the Board did not explicitly state that Blanas was required to show fraud upon the court to obtain relief. Nonetheless, its opinion defined this type of fraud and concluded that "we find nothing, including any of the employee's allegations, which rises to the level of fraud required for an independent action, as defined in the above cases." Furthermore, when it denied reconsideration, the Board stated that it had originally declined to set aside the C & R because it had concluded that it had no jurisdiction to do so on the basis of mistake and because it "did not believe that *fraud had been committed on the board* by the insurer." (Emphasis added.) The Board thus appears to have concluded that Blanas, to prevail, had to demonstrate fraudulent behavior constituting a fraud upon the tribunal. The Board did not consider whether there was "regular" fraud, nor did it treat Blanas's petition as a Rule 60(b)(3) motion alleging such fraud.

The Board's decision and the insurer's argument both imply that, because Blanas sought relief more than one year after the Board approved the C & R, he had to demonstrate there had been a fraud upon the tribunal. This notion is apparently based on an assumption that Rule 60(b) governs Blanas's petition. In our view, it does not. As we intimated in *Olsen Logging,* 856 P.2d at 1159 n. 4, Rule 60(b) may provide a convenient model for seeking relief from a C & R approved by the Board. Nonetheless, it is an inexact model. The beneficent purposes of Alaska's Workers' Compensation Act would not necessarily be advanced by wholesale

adoption of a judicial rule whose purpose is to balance societal needs for judicial finality against party needs for just treatment. Further, the Alaska Workers' Compensation Act contains no time limits applicable here, and we have been reluctant to impose time limits when the legislature has not chosen to do so. *Huston v. Coho Elec.,* 923 P.2d 818, 820 (1996); *Tipton v. ARCO Alaska, Inc.,* 922 P.2d 910, 913 (1996). Because we conclude that the one-year limitation found in Rule 60(b) does not apply to a petition asking the Board to set aside a C & R which was allegedly obtained fraudulently, a distinction between "regular" fraud and fraud upon the court has no bearing on the timeliness of Blanas's petition. To the extent it appears to have relied upon such a distinction in denying Blanas's petition, the Board erred. It consequently may have failed to weigh adequately the substance of Blanas's fraud claim or his related misrepresentation claim.

It follows that we reject the insurer's argument that Blanas's petition, filed some sixteen months after the Board approved the C & R, was untimely. Nothing in the workers' compensation act makes Blanas's petition untimely. The one-year limitation found in AS 23.30.130 applies to changes in conditions and mistakes; it has no express application to claims of fraud or misrepresentation. For reasons previously addressed, we decline to adopt Rule 60(b)'s one-year limit for such a case.

### 3. *Evidentiary Hearing*

■ The Board held that even if Blanas's allegations were true and Brower knew that the C & R rehabilitation goal was physically inappropriate for Blanas, these facts would not justify setting aside the C & R. Quoting statements from the C & R that Blanas had successfully run his own business and had been gainfully employed for over thirty years, the Board concluded that Blanas was "motivated to remove himself from the rehabilitation process" and "wished to become self-employed."[8] The Board did not explicit-

---

8. In support of its holding, the Board quoted the following language from the C & R:

> Mr. Blanas selected Kathy Williams for preparation of a reemployment benefits plan. Sev-

eral options have been explored including computer assisted drafting, hazardous material handling and at Mr. Blanas' request, paralegal. A market was found for both the computer

ly articulate the basis for its holding. It apparently believed that even if Blanas was unaware of the physical requirements of tank tightness testing, "good conscience" did not preclude enforcement of the C & R because Blanas had signed the C & R based on his desire to be out of the workers' compensation system and had the experience and skills to pursue rehabilitation and reemployment on his own.

The Board also stated that Blanas's "allegation that the employer had knowledge that the reemployment goal ... was physically inappropriate for him to perform is probably unfounded." The record shows that the rehabilitation specialist knew as of January 15 that tank tightness testing was inappropriate and memorialized in the January 28 report the date when this knowledge was acquired. Blanas's sworn averments assert or reasonably imply that he did not know of the unsuitability of this occupation (and thus the futility of the retraining) until after the Board had approved the C & R, and that the insurer concealed or failed to disclose that knowledge in time for Blanas either to negotiate settlement terms that guaranteed him retraining in an occupation he could follow, or, alternatively, to proceed to hearing to pursue all his statutory remedies.

Different conclusions might also be drawn. The day after the specialist learned of the physical requirements which disqualified Blanas for the occupation of tank tightness tester, she scheduled a meeting with Blanas to discuss that occupation. The reemployment report states that when Blanas and his wife met with the specialist on January 20, Blanas expressed an interest in the occupation of construction estimator and requested that the specialist explore this as an employment goal. This might imply that the rehabilitation specialist informed Blanas of the physical requirements of tank tightness testing at the January 20 meeting. The parties did not sign the C & R until February 13, and the Board did not approve the C & R and addendum until March 12. The Board apparently determined that Blanas was not influenced by the insurer's alleged acts, and, moreover, that those acts did not constitute fraud upon the court. Had it conducted a hearing at which evidence could be offered concerning those issues, perhaps the Board could have permissibly so determined.

■ Given Blanas's affidavits asserting that he did not know what the insurer knew when he signed the C & R, however, we conclude that the Board erred in holding that Brower was probably aware of the inappropriateness of the rehabilitation goal identified in the C & R and in implying that Blanas made a considered choice, uninfluenced by any alleged fraud attributable to the insurer. Substantial evidence does not support the Board's finding, because the Board never heard the evidence necessary to resolve this dispute. Blanas listed witnesses who allegedly would have testified on these matters, but the Board never heard them. Blanas asked for a hearing, but never received one. We cannot say that the Board's error was harmless just because some parts of the record imply that Blanas was equally knowledgeable and made a considered choice. Neither the Board nor we can conclude from the record that Blanas's allegations of fraud are without merit as a matter of law.

Blanas also argues that he was denied a fair hearing before the Board because it did not hear testimony and that the Board's procedures violated his due process rights guaranteed by article I, section 7 of the Alaska Constitution. It is not necessary to reach these arguments. Reversal and remand are required because we have concluded that Blanas established that there was a genuine fact dispute about whether the C & R was the product of fraud or misrepresentations;

---

assisted drafting and the hazardous material handling. Further training has been identified as available for both and both present the option of remunerative employment.

Mr. Blanas is aware that he could continue participating in reemployment benefits with the guidance of Kathy Williams. However, he feels that his background provides him with sufficient experience and training to conduct his own retraining program. Mr. Blanas, in the past, has been self-employed and successful, ran his own business and has been gainfully employed for over 30 years. He does not desire to remain within the workers' compensation system, but rather wishes to settle his case and pursue his own options for reemployment, including the potential of paralegal.

this dispute can be resolved only by further proceedings before the Board, including, if necessary, a hearing at which the parties can present testimony.

### 4. *Rehabilitation fund*

Finally, Blanas argues that the Board's decision does not resolve his rights to rehabilitation and to the $2,500 set aside for rehabilitation expenses. The Board's decision denying Blanas's petition for reconsideration, however, stated that the $2,500 was "apparently" still being held in trust and "should be paid." Given this observation, and the position taken by the insurer and Brower in their proposed second addendum (which authorized using the fund for the cost of real estate agent training), it seems undisputed that retraining costs up to the $2,500 maximum will be paid by the rehabilitation fund should the Board not set aside or modify the C & R. If the Board sets aside the C & R and reopens Blanas's claim, Blanas will have an opportunity either to seek an award of all necessary rehabilitation costs from the Board, or to bargain for them if the parties again discuss settlement. Alternatively, Blanas may succeed in persuading the Board to modify the C & R provisions, including those dealing with rehabilitation costs.

## IV. CONCLUSION

We REVERSE the superior court judgment and REMAND to that court with directions to remand to the Board for further proceedings consistent with this opinion.